# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No. 17-2428-MJ-Simonton

UNITED STATES OF AMERICA

v.

**SAMER H. BARRAGE and
RENATO J. RODRIGUEZ**

      **Defendants.**

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes ___X___ No

          Respectfully submitted,

          WIFREDO A. FERRER
          UNITED STATES ATTORNEY

BY:                

          FRANCISCO R. MADERAL
          ASSISTANT UNITED STATES ATTORNEY
          Fla. Bar. No. 41481
          99 N. E. 4th Street
          Miami, Florida 33132-2111
          TEL (305) 961-9159
          FAX (305) 530-7976
          francisco.maderal@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

#### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| SAMER H. BARRAGE and | ) | Case No. 17-2428-MJ-Simonton |
| RENATO J. RODRIGUEZ | ) | |
| | ) | |
| | ) | |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___1/2013-3/2017___ in the county of ___Miami-Dade___ in the

___Southern___ District of ___Florida___, the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| Title 18, United States Code, Sections 1956(h) | Conspiracy to Committ Money Laundering |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Refina Wills, S/A, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 3/21/17

_____
_Judge's signature_

City and state:          Miami, Florida

Andrea M. Simonton, U.S. Magistrate Judge
_Printed name and title_

# **AFFIDAVIT**

I, REFINA WILLS, Special Agent with the Federal Bureau of Investigation ("FBI"), having been first duly sworn, do hereby depose and state as follows:

## **INTRODUCTION**

1.      I submit this application in furtherance of an investigation worked with the Drug Enforcement Administration (DEA) and Department of Homeland Security Investigations (HSI).

2.      I am Special Agent Refina Willis with the Federal Bureau of Investigation (FBI), performing the duties provided by law and regulation, and empowered to conduct investigations of offenses against the United States.

3.      I have been employed by the FBI since April 19, 2015, as a Special Agent. I am currently assigned to the FBI Miami Division, first assigned to the Transnational Organized Crime squad, since a Counterterrorism squad, both focusing on unlawful money laundering and other financial crimes. Through my training, education and experience, I have become familiar with the manner in which a wide variety of violations of federal law, including drug trafficking, money laundering, other financial crimes, as well as violations of intellectual property rights and the methods in which the payment and laundering of illicit proceeds are conducted.

4.      This affidavit is made in support of a criminal complaint charging Samer H. BARRAGE, and Renato J. RODRIGUEZ with conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(a).

5.      Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the affidavit each and every fact known to me, but only those facts and circumstances that I believe are sufficient to establish probable cause.

1

6.     The statements contained in this affidavit are based on my investigation, information provided by others, and on my experience and training as a federal agent and that of other agents participating in the investigation, including agents of the FBI, the DEA, HSI, and the U.S. Customs and Border Protection (CBP).

## PROBABLE CAUSE

7.     Beginning around January 2013, Juan P. GRANDA, Samer H. BARRAGE, Renato J. RODRIGUEZ, and others conspired to commit money laundering by sending billions of dollars from the United States to Latin America with the intent to promote the carrying on of organized criminal activity, including illegal gold mining, gold smuggling and the entry of goods into the U.S. by false means and statements, and narcotics trafficking.

8.     GRANDA, BARRAGE, and RODRIGUEZ undertook this conspiracy in connection with their employment at NTR Metals ("NTR"),[1] a precious metals refinery.

9.     As a precious metals refinery, NTR buys unrefined precious metals, such as mined gold, refines it, and sells it for profit. The profit margins are small, often less than 0.5% of the value of the gold refined. So, to increase profits NTR must buy and refine as much gold as possible.

10.     NTR employs "sales" staff to find and buy as much gold as possible. GRANDA along with BARRAGE and RODRIGUEZ were NTR's Miami-based sales team responsible for finding and buying gold in Latin America and the Caribbean. NTR encouraged GRANDA,

---

[1] "NTR" or "NTR Metals" or "Elemetal" is the brand name of what is now Elemetal LLC, a precious metals company which, according to its website, "melt[s], mint[s], sell[s], ship[s], and store[s] precious metals around the world." NTR is headquartered in Dallas, Texas with, at various times relevant to this Complaint, offices around the world, including a Miami office located in Doral, Florida.

SAMER, and RODRIGUEZ to obtain as much gold as possible by compensating them with commissions based on the volumes of gold they purchased.

11.     In recent years, Miami emerged as a major international gold trading hub, particularly for Latin American gold, both legal and illegal. The majority of gold imported into the U.S. enters through the Miami International Airport, and several major gold refineries operate in South Florida, including NTR.

### Illegal Gold Mining, Smuggling & Money Laundering in Latin America

12.     Illegal gold, mined in violation of foreign law, is a significant problem throughout Latin America and particularly in Peru, where illegal mining is responsible for the devastation of large swaths of rainforest. Because illegal mining occurs in remote jungle areas, it is difficult to access and difficult to police, and it is often controlled by organized crime and smuggled along the same routes as narcotics. In Peru, illegal mining is supported by human trafficking, forced adult and child labor, and prostitution in and around mining camps. Areas in which illegal miners burn down the rainforest and strip away the surface of the earth remain barren because of contamination from chemicals such as mercury used in the mining process. The Madre de Dios region and the city of Puerto Maldonado, for instance, are well-known epicenters of illegal gold mining and smuggling activities in Peru.

13.     The international gold trade has become a common method for the laundering of illegal mining, narcotics and other criminal proceeds. Criminals frequently trade illegal gold through illicit shell or front companies using false or incomplete documents, often smuggled through third-party countries, and then sold to refineries in the U.S., in an effort to hide the true source, ownership, and origin of gold from foreign and U.S. law enforcement.

14.     Criminals use the same scheme to launder narcotics and other criminal proceeds. In general, gold is a good medium for money laundering because it has universal and readily ascertainable value and is difficult to trace. By way of example, a confidential source,[2] with established ties to Peruvian narco-traffickers, explained that he is aware of millions of dollars paid in the U.S. to Peruvian narco-traffickers. The narco-traffickers then physically smuggle the cash payments back to Peru where it is used to purchase-illegally mined gold, and the gold is then sold to refineries in the U.S. and elsewhere. Once the gold arrives at the refineries, the criminals receive wire transfer payments into the bank account of their choice. On the surface, the payment appears to be for a legitimate gold-sale transaction, and not from any underlying criminal activity.

15.     By way of another example, I am aware of an instance in which an individual attempted to purchase gold in Peru in order to launder the proceeds of an illegal internet gambling business operated from Costa Rica.

16.     Across Latin America, illegal gold smuggling and money laundering is a well-known problem and a prominent social and political issue. Several Latin American countries have initiated illegal gold, money laundering, and smuggling investigations, many of which involve gold being sold to NTR. For example, according to media reports:

a.     In late 2013, Peru seized approximately $18 million worth of gold bound for export to refineries in Miami and elsewhere, including NTR, on the basis that the exporters could not demonstrate the legal origin, possession, or purchase of the gold.[3] At least one of these companies sending gold to NTR was later identified as being financed by P.F., a well-known

---

[2] This confidential source is a convicted felon with other potential credibility issues. This information is provided as background only.

[3] http://elcomercio.pe/sociedad/lima/aduanas-incauto-media-tonelada-oro-ilegal-us18-millones-noticia-1683890

individual in Peru, previously accused but acquitted of narcotics money laundering.[4] P.F. has recently been arrested by the Peruvian government in connection with his alleged illegal gold mining and laundering scheme exceeding $500 million worth of gold.

b.      By late 2014, Latin American customs data revealed that beginning around February 2014 (after the illegal gold seizures and airport crackdowns in Peru), illegally mined gold from Madre de Dios and other regions of Peru, was being smuggled across the border into Bolivia and then exported to refineries in Miami, including NTR.[5]

c.      In mid-2016, Ecuador arrested numerous individuals in connection with an approximate $400 million gold money laundering scheme, involving Peruvian gold purchased in the Ecuadorian border city of Machala, which was then sold to refineries in Miami (independently known by your affiant to include NTR).[6]

d.      Also in mid-2016, Chile arrested numerous individuals in connection with several investigations into illegal gold smuggling, dating back to mid-2014, involving Peruvian gold smuggled into Chile near the Chilean border city of Arica and later gold from Argentina smuggled into Chile via the Paso Los Libertadores route through the Andes Mountains, the latter of which was then sold to NTR in Miami.[7]

17.      United States customs import records as well as NTR's own records, confirm NTR's involvement in these highly suspicious transactions and trends from 2013 onward, the same

---

[4]http://elcomercio.pe/sociedad/madre-de-dios/mitad-exportadoras-oro-mira-mineria-ilegal-noticia-1708977

[5] http://ojo-publico.com/12/los-vuelos-secretos-del-oro-ilegal

[6]https://www.verticenews.com/ruta-criminal-oro-ecuatoriano/

[7]http://ciperchile.cl/2016/08/19/la-trama-oculta-del-mayor-contrabando-de-oro-detectado-en-chile/

time period in which GRANDA, BARRAGE, and RODRIGUEZ conducted NTR's business throughout Latin America.

## NTR'S HIGHLY SUSPICIOUS LATIN AMERICAN GOLD IMPORTS

18.     United States customs import records strongly suggest that NTR purchased illegal gold in Peru beginning in late 2012 and then purchased smuggled Peruvian gold through Bolivia and Ecuador in 2014.

### Illegal Gold from Peru in 2013

19.     In 2013, NTR declared $980[8] million worth of gold imports from Peru, and was the largest U.S importer of Peruvian gold. This figure is remarkable in that NTR had only imported $73 million from Peru the year before, and had virtually no gold imports from Peru before that.

20.     Over a third of NTR's 2013 Peru imports ($340 million) came from just five companies, now known to have been financed by P.F. Each of those companies operated as apparent front companies: none had any U.S. gold import histories and each operated and exported for only several months, mostly one after the other and with overlapping straw owners.

21.     Five other exporters with similar patterns of no import history, short bursts of soaring exports and overlapping and related management, accounted for another $310 million of NTR's 2013 Peru imports. And similar, single companies with no import histories and short bursts of soaring exports made up the majority of NTR's remaining Peru imports in 2013, including for instance, one company which exported over $50 million worth of gold in 2013 to NTR over the course of just 6 months, never having previously done so.

22.     The vast majority of these companies did not purport to be operating gold mines, but simply to be gold "collectors," a vague business that involves nothing more specific than

---

[8] These U.S. customs import figures are approximate and rounded.

someone who buys gold from others. In addition, some of these "collectors" exported millions of dollars' worth of gold on an almost daily basis, which would have required these "collectors" to have access to similar amounts of cash to finance these daily gold purchases.

23.     In December 2013, Peru cracked down on illegal gold shipments from its international airport in Lima, seizing gold, including gold destined to NTR from one of the P.F. companies, and instituting strict gold export requirements and controls at Peru's international airports.

24.     Almost none of the companies that NTR imported gold from in 2013 went on to export to the U.S. again thereafter.

25.     Following Peru's illegal gold crackdown, NTR's imports from Peru sank from $980 million in 2013 to $79 million in 2014, and as discussed below, its imports from Peru's neighboring countries of Ecuador and Bolivia, grew by $485 million.

**Illegal Gold Smuggled through Ecuador & Bolivia in 2014**

26.     After Peru's illegal gold crackdown in December 2013, NTR's Peru gold imports sank, and its imports from Ecuador and Bolivia grew by $485 million, as graphically depicted below:



27.     With respect to Ecuador, in 2014 NTR's gold imports tripled to $337 million (from $101 million the year before), and $128 million of that came from Spartan del Ecuador, one of two companies connected to the $400 million gold money-laundering scheme prosecuted in Ecuador. Moreover, virtually all of the gold NTR purchased from Ecuador, including the gold from Spartan del Ecuador was routed through an intermediary company, MVP Imports LLC, a Florida entity whose principal address is a small boutique home store on Miracle Mile in Coral Gables.[9]

28.     With respect to Bolivia, in 2014 NTR's gold imports grew more than ten-fold to $270 million (from $19 million the year before), and $250 million of that came from several Bolivian companies (and one Peruvian company) with no history of ever having exported gold to the U.S. from Bolivia prior to 2014, one of which single-handedly accounted for $220 million.

---

[9] Although NTR was the ultimate purchaser of the gold, MVP Imports was the declared "importer of record," on U.S. customs declarations, masking NTR's role as the ultimate purchaser, on the U.S. customs import records.

**Illegal and Smuggled Gold in Colombia, Chile, Guyana, and the Caribbean**

29.     NTR's highly suspicious gold imports did not cease in 2014 and were not limited to Peru, Ecuador, and Bolivia. As NTR's gold imports from Ecuador and Bolivia slowed after 2014, the majority of its imports shifted in 2015 to Peru's third neighbor: Colombia,[10] with additional rising imports from Chile, Guyana, and the Caribbean.

30.     Altogether, NTR's import records suggest that NTR imported $100s of millions in illegal gold from Peru in 2013, and was able to maintain this billion-dollar-a-year enterprise, by smuggling illegal gold through a shifting array of Latin American countries, all falling under the sales responsibility of GRANDA, BARRAGE, and RODRIGUEZ.

31.     All told, NTR imported over $3.6 billion dollars' worth of gold from Latin America from 2012 through 2015.

32.     Confidential sources and other evidence confirm that GRANDA, together with BARRAGE, RODRIGUEZ and others, knowingly conspired to purchase gold with the intent to promote the carrying on of organized criminal activity, including illegal gold mining, gold smuggling and the entry of goods into the U.S. by false means and statements to U.S. Customs, and narcotics trafficking.

**ILLEGAL GOLD SMUGGLING & MONEY LAUNDERING CONSPIRACY**

33.     NTR's salespersons promote new business and find more gold to purchase by "smiling and dialing," that is, by learning who has gold to sell, making introductions, forming customer relationships, and making sales pitches designed to win new business. In forming

---

[10] NTR's 2015 imports from Colombia more than doubled to $722 million, from $268 million the year before, and accounted for more than half of all of Colombia's gold exports to the United States.

customer relationships, NTR salespersons visit customers in country, invite them to tour NTR facilities in the U.S., and entertain them, all in an effort to win their business and buy their gold so that NTR can profit by refining it and the salespersons can earn commissions.

34.     NTR competes for customers against other refineries, all of whom are offering to pay essentially the same price for the customer's gold—the spot price set by the international gold markets. Accordingly, the primary way that NTR competes is by paying for the gold faster than other refineries. For instance, if "Refinery X" will pay $1,000,000 for an amount of gold within 48 hours of receiving it, but NTR will pay the $1,000,000 within 24 hours, NTR will likely win the business. The customer selling gold wants payment as soon as possible so it can purchase another round of gold to sell as soon as possible.

35.     Moreover, by paying its customers faster NTR buys more gold and makes more profits over time. The sooner the customer is paid, the sooner the customer can obtain additional gold, and the sooner it can sell that additional gold to NTR, and the more frequently this cycle occurs, the more gold NTR purchases over time.

36.     For all of the billions of dollars' worth of gold shipped from Latin America to NTR in Miami, NTR sent billions of dollars in wire payments to Latin America from the United States. In effect, NTR promoted its clients' business with fast payments, and promoted the Latin American gold trade in general with billions of dollars of wire transfers.

37.     With respect to Latin America, GRANDA, BARRAGE, RODRIGUEZ, and others conspired to send these international wires with the intent to promote further gold transactions and businesses they knew involved: organized crime, gold smuggling and entry of goods into the U.S. by false means and statements, illegal mining, and narcotics trafficking, all in the hopes of creating more profits for themselves and NTR.

## Encrypted Communications

38.     Throughout the time of the conspiracy, GRANDA, BARRAGE, RODRIGUEZ and their co-conspirators communicated with each other and their clients primarily via peer-to-peer encrypted messaging applications on their cell phones, such as WhatsApp, in order to avoid detection. Nevertheless, law enforcement has been able to obtain the content of some of these encrypted communications.

39.     In WhatsApp group chats between GRANDA, BARRAGE, and RODRIGUEZ, all three acknowledge and discuss their conspiracy to purchase illegally mined and smuggled gold, for instance:

a.      On October 1, 2014, GRANDA traveled to Puerto Maldonado in Peru and discussed with BARRAGE and RODRIGUEZ their sources of illegal Peruvian gold; GRANDA made reference to himself as a modern-day Pablo Escobar:

| | |
|---|---|
| GRANDA: | Just landed in Puerto 93 degrees |
| RODRIGUEZ: | Stay safe |
| GRANDA: | I'm like Pablo coming to Ecuador to get the coke |
| | * * * |
| GRANDA: | I have [Person 1]'s material routed to the priests… |
| | * * * |
| RODRIGUEZ: | So [Person 1] is buying as [Company 1] and exporting thru trade as what exporter? San Fidel? |
| GRANDA: | She is buying but it's all under the table no docs |
| RODRIGUEZ: | So who is legalizing it? |

| | |
|---|---|
| GRANDA: | And selling it to the curas they ship under San Fidel, or Carbocol or trade … San Fidel provides the papers[11]…What r u trying to set me up |
| BARRAGE: | So all get metal is coming to us? Just need to know cause we thought that [Company 1] was done. |

    b.    On October 28, 2014, RODRIGUEZ traveled to La Paz, Bolivia and complained that it was GRANDA's fault that they were doing business in Bolivia because of GRANDA's role in causing Peru's illegal gold crackdown and then acknowledged purchasing smuggled Peruvian gold in Bolivia:

| | |
|---|---|
| RODRIGUEZ: | Finally landed in la Paz |
| | On my way to hotel to meet [Person 2] for dinner |
| BARRAGE: | Never been so happy |
| | * * * |
| RODRIGUEZ: | I think this is all Juan's fuck up |
| | * * * |
| BARRAGE: | Had he not fucked up Peru you wouldn't be chasing ounces in modern day 1972 |
| RODRIGUEZ: | He a lying fuck up |
| GRANDA: | I might have lied about fucking up, but at least I am not in Bolivia |

---

[11] Minera San Fidel S.A., Trade Minerals S.A.C., and Carbocol Peru S.A.C. were all clients of NTR's at the time. Additionally, internal NTR emails show that in August of 2014, GRANDA, with BARRAGE, and RODRIGUEZ, submitted a client application for Trade Minerals LLC, a Florida entity related to client Trade Minerals S.A.C., in which SALESPERSON 2 would explain that the company principals were all "in seminary together," *i.e.*, priests or, in Spanish, *curas*.

| | |
|---|---|
| RODRIGUEZ: | Fuck off |
| | Bolivia is keeping us afloat |
| | Bolivia is where it's at |
| GRANDA: | Yea, tell all of my peru gold good night |
| | I'm taking my shit back |
| | I think [BARRAGE] is smuggling the gold out of peru so he won't pay me lol |
| RODRIGUEZ: | You Peruvians fucked it up |
| BARRAGE: | [*sending image of small presumably African children*] |
| | That's the thanks I get for feeding a village of niglets |
| GRANDA: | Lmao |

c.      On December 7, 2014, GRANDA sent a link to a Spanish-language online article from December 5, 2014, which detailed illegal gold mining in Peru and gold smuggling through Bolivia,[12] and the following conversation ensued:

| | |
|---|---|
| GRANDA: | [*sending Peru-Bolivia gold smuggling article*] |
| | Did u read it? |
| | * * * |
| BARRAGE: | Juan. Find more. There is even one that came out on Reuters. Looks like a hot topic all of a sudden. |
| RODRIGUEZ: | Shit |
| BARRAGE: | It doesn't mention us though |

---

[12] http://ojo-publico.com/12/los-vuelos-secretos-del-oro-ilegal

13

RODRIGUEZ:          Should I postpone BOLIVIA trip??

d.       On December 19, 2014, GRANDA and BARRAGE bragged to each other about their respective "mules" and the amount of gold they have smuggled, even swapping pictures of the young men they employ as the mules.

BARRAGE:            Just another day in Colombia

                    150kg

                    [*sending pictures of gold bars with and without black shrink-wrapping*]





GRANDA:            Nice

                    * * *

BARRAGE:            The mules had to shit the packets

GRANDA:            Lol

                    Let me know when he moves 300 in one day

14

BARRAGE:    [*sending picture of young, presumably Colombian, male with a backpack*]



GRANDA:    That's mine

[*sending picture of young, presumably Peruvian, male*]



BARRAGE:    What kind of limean robbery are you involved in now?

GRANDA:    I'm in charge of getting us material

e.    On February 2, 2015, BARRAGE, complains about the month-to-date (MTD) gold figures, and suggests that GRANDA obtain more smuggled Peruvian gold from Bolivia and Ecuador:

BARRAGE:    MTD is an ugly picture

\* \* \*

| | |
|---|---|
| BARRAGE: | Juan |
| | We need more Peruvian gold from Bolivia and Ecuador |
| | Can u make it happen? |
| GRANDA: | Anything for [RODRIGUEZ] |

f.      On May 27, 2016, GRANDA complains about the volume of gold brought in that month because of a "state of emergency" in Madre de Dios[13] and complains about not having been able to smuggle more gold through Bolivia and Guyana:

| | |
|---|---|
| GRANDA: | Looks like 86k |
| | We got fucked by price |
| RODRIGUEZ: | Fuck u |
| | Still a good month |
| GRANDA: | A good month is 94k+ |
| BARRAGE: | [sending an unknown media file] |
| RODRIGUEZ: | Then you should have pulled your weight |
| GRANDA: | I have failed… Spot price and state of emergency in madre de dios got us… I caht [sic] believe I didn't plan it |
| | Yet Bolivia & Guyana have VIP exits to export and u can't get anymore Peruvian good? |

---

[13] In May 24, 2016, media reports explained that Peru had declared a state of emergency in Madre de Dios because "hair samples from local people in the Madre de Dios area of eastern Peru revealed levels of mercury up to 16 times what it considered a safe limit" and that "The drastic measures have been triggered by a wave of illegal gold mining in the area that has seen as many as 100,000 miners destroy vast swathes of the Amazon, ravage river ecosystems with dredgers, and poison the water table with mercury and other mining byproducts." https://news.vice.com/article/peru-declares-state-of-emergency-in-its-jungles-due-to-rampant-mercury-poisoning

16

RODRIGUEZ:       Fail to plan, plan to fail

GRANDA:          *gold

                              Those country's r looser than BARRAGE's ass after riding a horse.

g.     On June 26, 2016, BARRAGE sends a link to an article about the gold money laundering arrests in Ecuador relating to Spartan del Ecuador[14] and warns his colleagues about wiretaps and communicating via phone:

BARRAGE:        [*Sending link to article*]

\* \* \*

GRANDA:          WPM is mentioned

                              Glad we aren't

                              Don't like the fact that calls were intercepted

BARRAGE:        Keep telling you guys about the calls

                              Hopefully this helps

GRANDA:          Yea you are right

                              But the calls with customers, might just have to do everything face to face

                              U don't speak with customers, so u don't have those situations

                              We need to find a way to avoid this

BARRAGE:        Should be nothing to avoid

                              That's the whole point you #simplebitch

---

[14] https://www.verticenews.com/ruta-criminal-oro-ecuatoriano/

40.    The WhatsApp chats contain numerous other communications among the co-conspirators acknowledging and furthering the conspiracy.  In addition, GRANDA sent numerous chats to third parties in which he brags about his criminal activity, for instance:

a.    On October 24, 2014, GRANDA explained to friends in a discussion about encrypted chats: "As far as security, I already have to worry about intelligence officials monitoring my calls with exporters anyways...Peru is #1 in drug exports and illegal mining exports."

b.    On November 12, 2014, GRANDA bragged to friends that one of his clients was involved in narco-trafficking, having access to wholesale-priced kilograms of cocaine in Bolivia, and that a second client had ordered the murder of the first client:

> Peru exports the most illegal drugs in the world, and the only thing that they export more than that is informal gold ... Remember when I was in Bolivia and I said I know someone that can get a $700 kilo of coke ... Well I helped him move to cusco and get a  million $ over the border ... He is a German that is my customer from Bolivia ... Only thing is that on Friday my customer from cusco put out a hit on him for some bad business.

c.    On December 5, 2014, GRANDA sent to his friends the same picture of his "mule" from Peru that he would later send to BARRAGE, and RODRIGUEZ on December 19, 2014 and brags: "Behind the scenes in the gold business #Cusco #Vice ... Little do u know that there is $800k in a bookbag under that desk."

d.    On February 12, 2016, GRANDA's friend sent him a text "wishing ... my favorite gold smuggle [sic] a very happy valentine's weekend" and  GRANDA responded "lol I can read the jealousy between the lines."

**Confidential Cooperators**

41.    Interviews of several confidential sources in Latin America and the United States with personal knowledge of the events have confirmed the criminal conspiracy among GRANDA, BARRAGE, RODRIGUEZ, and others. For instance:

18

42.   Confidential Source 1:       In   late   2016,   law   enforcement   interviewed Confidential Source 1 (CS1) regarding his admitted illegal gold money laundering activities in Peru. CS1 explained that he conspired with GRANDA, BARRAGE, and RODRIGUEZ to traffic in illegal Peruvian gold, much of which involved P.F., and that the conspiracy evolved over time from using obvious Peruvian front companies, to smuggling through Bolivia and Ecuador, to using more sophisticated Peruvian front companies, to smuggling through farther out countries, including islands in the Caribbean. For instance, according to CS1:

a.       In 2013, CS1 assisted P.F. in exporting illegally mined gold without any documentation to NTR through a series of front companies. When the Peruvian authorities began to question a front company because of the sudden high volume of unexplained gold shipments, a new front company was created and the gold shipped through it. CS1 was introduced to GRANDA, BARRAGE, and RODRIGUEZ at a birthday party for P.F. in early 2013,[15] and would later see the NTR employees at several other meetings with P.F., including one meeting at P.F.'s house. According to CS1 all three NTR employees were aware of P.F.'s involvement with the front companies and that the gold was illegal.

b.       GRANDA, BARRAGE, and RODRIGUEZ went on to purchase additional illegally mined gold through front companies in 2013 with CS1, separate from the P.F. companies. This practice ended at the end of 2013, when the Peruvians cracked down on illegal gold shipments from its international airport.

---

[15] Travel records confirm that GRANDA and BARRAGE, and RODRIGUEZ travelled to Lima, Peru from Miami on the days surrounding P.F.'s birthday.

c.      In early 2014, CS1's business with NTR in Peru fell off as little gold was exported from Peru and gold began being smuggled through Bolivia and Ecuador. During this time CS1 assisted GRANDA, BARRAGE, and RODRIGUEZ in learning about gold "leads" in Bolivia.

d.      In late 2014, GRANDA approached CS1 with a new Peruvian front company scheme, involving illegal gold being spread among many front companies exporting small volumes at the same time, rather than one front company at a time exporting high volumes, so as to avoid suspicion. CS1 and GRANDA went on to use the many-front-company approach to again export illegally mined gold to NTR from Peru; GRANDA dictated which companies to route the gold through.

e.      Later GRANDA asked CS1 to investigate the possibility of smuggling Peruvian gold though a Caribbean island, and introduced CS1 to individuals capable of moving gold through the Caribbean island, but the logistics of moving gold from Lima, Peru to the Caribbean island proved too difficult, and the scheme was not executed.

f.      Over the course of several years, CS1 was involved with the sale of $100s of millions worth of gold to NTR from Peru; CS1 believes that only one shipment valued around $50,000 might have been legal.

43.    Confidential Source 2 (CS2):        In late 2016, law enforcement interviewed CS2 regarding his admitted illegal gold smuggling and money laundering activities. CS2 explained that he conspired with NTR, through BARRAGE and RODRIGUEZ, to commit gold smuggling and money laundering, involving Chile, Argentina, Africa, and Europe, and that BARRAGE and RODRIGUEZ acknowledged their part in the illegal gold smuggling and laundering conspiracy involving Peru, Ecuador and Bolivia. More specifically, according to CS2:

a.     In or around 2014, in Peru, CS2 made contact with "SMUGGLER 1," who was also involved in the gold business, and, specifically, selling Peruvian gold. CS2 agreed to purchase gold from SMUGGLER 1 and both agreed it was preferable to smuggle the gold across the Peruvian border into Chile and then export the gold from Chile concealing its true country of origin—Peru.

b.     In order to smuggle the gold, CS2 would fly to the Chile-Peru border where he would drive across the border with cash (often $1,000,000 USD or more) hidden in the door panels of his car. CS2 then would rendezvous with SMUGGLER 1 in the Peruvian city of Tacna where he would exchange the cash for gold and then drive back across the border with the gold hidden in the door panels. CS2 smuggled gold from Peru to Chile in this fashion, five to ten times during the summer of 2014, moving a total of approximately 300kg of gold, worth around $10,000,000 USD, and then selling it to another company for export from Chile. In or around August 2014, CS2's Peruvian gold smuggling scheme was discovered by Chilean authorities who seized some of the contraband gold after CS2 crossed the border into Chile.

c.     After the seizure, CS2 was no longer able to purchase gold from SMUGGLER 1 in Peru. CS2 began searching for a new supplier of gold and a new exporting company. CS2 began to negotiate with an Argentine gold dealer: "SMUGGLER 2." SMUGGLER 2 was willing and able to smuggle contraband gold from Mendoza, Argentina to CS2 in Santiago, Chile. CS2 was missing only an export partner to sell the gold to. CS2 asked his former smuggling partner from Peru, SMUGGLER 1, whether he had any export contacts and SMUGGLER 1 suggested NTR in Miami, Florida and its representative, RODRIGUEZ.[16]

---

[16] Internal NTR records confirm that NTR previously imported gold from an apparent Peruvian front company associated with SMUGGLER 1, which exported over $50 million worth of gold to NTR over the course of several months in 2013.

21

d.      In or around September 2014, CS2 submitted applications with NTR to begin selling and exporting gold through his two corporations, which were approved. In or around November 2014, CS2 sent his first shipment of gold to NTR in Miami and traveled to Miami to meet RODRIGUEZ and other NTR employees in order to discuss their future business. CS2 stayed at a Hyatt Hotel in Coral Gables, Florida for this first trip to Miami, and, after he arrived, RODRIGUEZ picked up CS2 from the Coral Gables' hotel, along with BARRAGE. BARRAGE and RODRIGUEZ then took CS2 to lunch at the "Houston's" restaurant in Coral Gables.

e.      During lunch, BARRAGE explained that he was NTR's Vice President of Latin America and the Caribbean, and RODRIGUEZ explained that he was NTR's Director of Sales for Latin America. Both explained that CS2 could trust them because they wanted to support him and keep a business relationship going in the long term. BARRAGE and RODRIGUEZ explained that they could help CS2's business grow by getting his payments to him sooner. BARRAGE and RODRIGUEZ stated that SMUGGLER 1 was a good friend of theirs and that they had met him in Lima, Peru several times, and RODRIGUEZ mentioned that SMUGGLER 1 had informed them of CS2's previous Peruvian smuggling operation. BARRAGE and RODRIGUEZ acknowledged difficulties exporting gold directly from Peru to the U.S. and that a lot of gold is smuggled from Peru to the neighboring countries of Bolivia and Ecuador for export to the U.S. BARRAGE and RODRIGUEZ then stated that they exported a lot of gold from Bolivia and Ecuador, which CS2 interpreted as a signal that they were also smuggling gold from Peru.

f.      During the lunch, CS2 explained to BARRAGE and RODRIGUEZ his plan to smuggle gold from Argentina to Chile for sale to NTR. BARRAGE and RODRIGUEZ asked whether it was possible to do so without getting caught, and CS2 explained that it would depend on his ability to justify the amount of gold he was exporting to the Chilean customs authorities.

BARRAGE and RODRIGUEZ asked how CS2 would justify the amounts, and CS2 explained that he would claim the gold came from coins he was purchasing and smelting. BARRAGE and RODRIGUEZ responded that CS2 should attempt this scheme and went on to explain that NTR was a prestigious firm, accredited by COMEX and the LBMA and that once the gold reached the U.S., there would be no issues. All agreed that future conversations regarding smuggling should take place in person and not over phones or in writing.

g.      After lunch, BARRAGE and RODRIGUEZ took CS2 to NTR's facility in Doral, Florida for a tour. After the tour, all three met in an office and reiterated their agreement to smuggle gold from Argentina to Chile and export the gold from Chile to the U.S., without disclosing Argentina as the true country of origin on any customs documents or otherwise.

h.      During CS2's stay in Miami, BARRAGE and RODRIGUEZ assisted CS2 in forming a corporation in Miami, and opening a corresponding U.S. bank account. CS2 had previously explained to RODRIGUEZ that he was having difficulties maintaining bank accounts in Chile due to anti-money laundering compliance reasons, and at the Houston's lunch, BARRAGE and RODRIGUEZ explained to CS2 that they had an accountant in Miami who could assist him in opening a U.S. corporation account. At one point, RODRIGUEZ drove CS2 to an accountant's office and then to a bank representative (both of whom RODRIGUEZ had a relationship with and introduced CS2 to) and successfully assisted CS2 in forming a Florida corporation and bank account.

i.      After CS2's trip to Miami and meetings with BARRAGE and RODRIGUEZ, he proceeded to purchase the smuggled gold from SMUGGLER 2 in Argentina and export it to NTR in Miami, which falsely claimed Chile as the country of origin in its U.S. customs declarations.

j.      In or around December of 2014, CS2 exported approximately $5.5 million USD worth of gold to NTR and would go on to export approximately an additional $15 million USD worth of gold to NTR. CS2 estimates that 90% of this gold was illegally smuggled from Argentina.

k.      After the successful shipments of smuggled gold in December 2014, BARRAGE and RODRIGUEZ traveled to Santiago, Chile to visit with CS2 in or around January 2015. At a meeting in CS2' office, BARRAGE, RODRIGUEZ, and CS2 confirmed that the gold smuggling operation from Argentina to the U.S. had been a success. BARRAGE and RODRIGUEZ stated that they knew CS2 had begun to send the smuggled gold based upon the sudden increase in volume.

l.      During the meeting, CS2 mentioned the possibility of purchasing large amounts of gold in Africa and inquired of NTR's ability to purchase the gold from him. BARRAGE and RODRIGUEZ explained that they would not be allowed to purchase gold if Africa was listed as the country of origin. BARRAGE and RODRIGUEZ explained, however, that they wanted to purchase the gold and that they could assist CS2 in moving the gold through Europe in order to obscure its true country of origin. BARRAGE and RODRIGUEZ explained that it was simply a matter of coordinating activity, that NTR has offices in Europe, including in Birmingham, United Kingdom and Barcelona, Spain, and that NTR has knowledge of European customs' laws. BARRAGE and RODRIGUEZ encouraged CS2 to travel to Africa and arrange to purchase and smuggle as much gold as possible. BARRAGE and RODRIGUEZ had explained to CS2 that NTR pays them a commission based upon the volume of gold they purchase and that they were always looking and willing to purchase more gold.

m.      Later at lunch in Santiago, Chile, BARRAGE and RODRIGUEZ proposed an additional gold smuggling scheme to CS2. BARRAGE and RODRIGUEZ explained that NTR had a potential customer in Ecuador who was selling gold smuggled from Peru, but that NTR's anti-money laundering compliance department had denied the customer approval because the potential customer was also in the business of home appliances, which was considered suspicious.[17] BARRAGE and RODRIGUEZ proposed that CS2 purchase the gold from Ecuador using the U.S. company they had helped him create and then sell the smuggled Peruvian gold to NTR.

n.      BARRAGE and RODRIGUEZ stated that they were buying 200 to 300 kilograms per month of smuggled Peruvian gold from a cooperative in Bolivia.[18]

o.      Later that night, BARRAGE and RODRIGUEZ took CS2 out to a club in Santiago, Chile, where they entertained him with alcohol and prostitutes, which they purchased.[19]

p.      BARRAGE and RODRIGUEZ had encouraged CS2's travel to Africa and were interested in the amount of gold that could be purchased there. In or around February 2015, CS2 traveled to Tanzania, Africa for approximately seventeen (17) days. When CS2 arrived at the airport in Tanzania, he was immediately introduced to a local gold supplier.

---

[17] Internal NTR emails corroborate that RODRIGUEZ, with BARRAGE, had previously submitted an application to open an account with an Ecuadorian individual involved in the appliance business, which was rejected by NTR because "[a]ppliance businesses have been historical venues for North American-South American traffickers to launder drug cash." CS2 is not known to have had any access to internal NTR emails.

[18] Internal NTR emails and sales records, as well as U.S. customs import data, confirm that around the time of this meeting with CS2, NTR was exporting gold from "mining cooperatives" in Bolivia through a single company, with total volumes exceeding 700 kg per month.

[19] Encrypted chats among GRANDA, BARRAGE, and RODRIGUEZ corroborate their penchant for hiring prostitutes while in Latin America on gold business, and even show the co-conspirators sharing photos of their latest prostitutes and comparing them to previous prostitutes.

q.      The local gold supplier showed CS2 a lot of gold that was not yet exported out of Africa because the gold had not cleared customs due to unpaid taxes. After showing CS2 this gold, CS2 agreed to pay to begin the process.

r.      CS2 called BARRAGE and RODRIGUEZ to give them an update and BARRAGE and RODRIGUEZ encouraged CS2 to keep trying to work on getting the smuggled gold out of Africa, and reiterated that they would all make a large profit on moving the gold out of Africa to sell to NTR.

s.      Ultimately, the trip was unsuccessful. CS2 lost approximately $300,000 USD, mostly in unreturned payments to the African supplier, in the failed attempt to smuggle gold through Africa to NTR. CS2 and NTR never received any of the gold.

## CONCLUSION

44.     Based upon the information provided above, I respectfully submit that probable cause exists to believe that from  in or around January 2013 and continuing to the present Samer H. BARRAGE, Renato J. RODRIGUEZ,  and others conspired to transport, transmit and transfer funds to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A). The specified unlawful activity including:

a.      The entry of goods by means of false statements, in violation of Tile 18, United States Code, Section 542;

b.      An offense against a foreign nation, that is, a violation of, Legislative Decree 1102, Article 307-A, Crime of Illegal Mining against the Republic of Peru, with respect to

which the United States would be obligated to by a multilateral treaty to extradite the alleged offender if the offender were found within the territory of the United States; and

        c.     An offense against a foreign nation involving the manufacture importation, sale or, distribution of a controlled substance (as such term is defined for the purpose of the Controlled Substances Act).

Respectfully submitted,

REFINA WILLS, SPECIAL AGENT,
FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed before me
this 21ST day of March, 2017.

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE