# Exhibit 2

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                     CASE NO. 17-20215-CRIMINAL-SCOLA
 3

 4   UNITED STATES OF AMERICA,          Miami, Florida

 5                  Plaintiff,          April 3, 2017

 6         vs.                          1:55 p.m.

 7   SAMER BARRAGE,

 8                  Defendant.          Pages 1 to 41
     _____
 9

10                       DETENTION HEARING
          BEFORE THE HONORABLE PATRICK A. WHITE,
11               UNITED STATES MAGISTRATE JUDGE
          (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)
12

13
     APPEARANCES:
14

15   FOR THE GOVERNMENT:       FRANCISCO MADERAL, JR., ESQ.
                               ASSISTANT UNITED STATES ATTORNEY
16                             99 Northeast Fourth Street
                               Miami, Florida 33132
17

18   FOR THE DEFENDANT:        MARCOS BEATON, JR., ESQ.
                               JARED M. LOPEZ, ESQ.
19                             BLACK, SREBNICK, KORNSPAN & STUMPF
                               201 South Biscayne Boulevard
20                             Suite 1300
                               Miami, Florida 33131
21

22   TRANSCRIBED BY:           LISA EDWARDS, RDR, CRR
                               Official Court Reporter
23                             United States District Court
                               400 North Miami Avenue
24                             Twelfth Floor
                               Miami, Florida 33128
25                             (305) 523-5499
```

```
 1              THE COURTROOM DEPUTY:  All rise.

 2              Case No. 17-20215-Criminal-Scola.

 3              MR. MADERAL:  Good afternoon, your Honor.  Frank

 4   Maderal on behalf of the United States.

 5              THE COURT:  Good afternoon, sir.

 6              Okay.  It looks like this case initially was here for

 7   an initial appearance.  Correct?

 8              MR. MADERAL:  That's correct, your Honor.

 9              THE COURT:  But now there's a -- it's my understanding

10   that there's a detention hearing?

11              MR. MADERAL:  Well, our position is that we're

12   prepared -- we're seeking pretrial detention.  And we're

13   prepared to move forward today.  I also believe that the

14   defense is not asking for a continuance.

15              THE COURT:  Not asking for what?

16              MR. MADERAL:  A continuance of the pretrial detention

17   hearing.

18              THE COURT:  Okay.  Counsel?

19              MR. BEATON:  Good afternoon, your Honor.  Marcos Beaton

20   and Jared Lopez on behalf of Samer Barrage.

21              That is correct.  We are prepared to move forward with

22   the pretrial detention hearing.

23              THE COURT:  Okay.  This is a conspiracy to commit money

24   laundering.  Correct?

25              MR. BEATON:  Yes, sir.
```

```
 1              THE COURT:  Okay.  Government, how would you like to
 2    proceed?
 3              MR. MADERAL:  Your Honor, I'd like to proceed by
 4    proffer.
 5              THE COURT:  Okay.
 6              MR. MADERAL:  It's a little bit lengthy, and only
 7    because it's sort of a lengthy conspiracy.  But I'll give your
 8    Honor a brief outline of the three parts, just so your Honor
 9    has a framework for the proffer.
10              The first part of the proffer, I intend to just
11    overview the conspiracy.
12              THE COURT:  Okay.
13              MR. MADERAL:  And the second part of the proffer will
14    be a little bit more of the strength of evidence and particular
15    role of Mr. Barrage.
16              And then the third part of the proffer, which I think
17    is really the crux of this hearing today, is Mr. Barrage's
18    conduct in the last two weeks since his Co-Defendant was
19    arrested, which the United States believes gives rise to the
20    basis of risk of flight.
21              THE COURT:  Okay.  Let's see if you can put it all
22    together.
23              MR. MADERAL:  Let's see.
24              All right, your Honor.  We're proceeding under risk of
25    flight.
```

1          Mr. Barrage is now charged by indictment with

2     conspiracy to commit money laundering.  The statute carries a

3     20-year max.  The guidelines as we calculate using a $550

4     million object come out to life under 2S1.1.

5          THE COURT:  I mean, the number -- I missed it.

6          MR. MADERAL:  A $550 million object.  And I use that

7     only because that's the top of the 2B1.1 table.  I actually

8     think the object is arguably higher than that.  So the point

9     is, your Honor, that there is a high -- high sentencing factor

10    here in this case.

11         As for the overview of the conspiracy, as alleged in

12    the complaint, beginning around 2013 and during his employment

13    as vice president of sales with NTR -- three letters, N-T-R --

14    Metals, a precious metals refinery, Barrage conspired with

15    fellow NTR employees and Co-Defendants Juan Granda and Renato

16    Rodríguez and others to purchase billions of dollars' worth of

17    illegal and smuggled Peruvian gold from criminal organizations

18    in Peru and elsewhere with the intent to promote illegal gold

19    mining, foreign bribery, narcotics trafficking and false

20    statements to enter goods into the United States.

21         Throughout the time of the conspiracy, illegal gold

22    mining, gold smuggling and gold money laundering were

23    well-known problems in Peru and elsewhere in South America.

24         Rather than work to avoid purchasing any illegally

25    sourced gold, Barrage and his co-conspirators conspired to

1   increase their profits by knowingly purchasing gold through and

2   with foreign shell companies, smuggling routes and false

3   statements to the US Customs authorities, foreign bribery and

4   from individuals known to the conspirators to be involved in

5   illegal gold mining and narcotics trafficking.

6           The scope of the conspiracy is enormous.  NTR imported

7   over $3.6 billion worth of gold from Latin America from 2012

8   through 2015.

9           THE COURT:  What was that number again?

10          MR. MADERAL:  3.6 billion, all of which was organized

11  and supervised by Barrage and his co-conspirators.

12          In 2013 alone, NTR declared 980 million worth of gold

13  imports from Peru and was the largest US importer of Peruvian

14  gold.

15          This figure is remarkable in that NTR had only imported

16  73 million from Peru the year before and had virtually no gold

17  imports before that -- from Peru before that.

18          Over a third of NTR's 2013 Peru imports, approximately

19  340 million, came from just five companies now known to have

20  been financed by a person we'll call by the initials P.F., a

21  well-known Peruvian currently under prosecution in Peru for

22  illegal gold money laundering relating to gold sent to NTR.

23          Each of these companies operated as apparent front

24  companies.  None had any US gold import histories and each

25  operated and exported for only several months, mostly one after

1    the other, and with overlapping straw owners.

2         Five other exporters with similar patterns of no import

3    history, short bursts of soaring exports and overlapping and

4    related management accounted for another 310 million of NTR's

5    2013 Peruvian imports.

6         And single -- and similar single companies with no

7    import histories and short bursts of soaring exports made up

8    the majority of NTR's remaining Peru imports in 2013.

9         In December of 2013, Peru cracked down on illegal gold

10   shipments from its international airport in Lima, seizing gold,

11   including gold destined to NTR, from one of the P.F. companies,

12   and instituting strict gold export requirements and controls at

13   Peru's international airports.

14        Following Peru's illegal gold crackdown, NTR's imports

15   from Peru sank from 980 million in 2013 to 79 million in 2014.

16   NTR's imports from Peru's neighboring countries of Ecuador and

17   Bolivia grew by 485 million that same year.

18        Communications among the co-conspirators demonstrate

19   that they were knowingly and intentionally purchasing and

20   promoting illegal gold mining in Peru and smuggling through

21   Ecuador and Bolivia.

22        That's the overview of the first part.  Now I would

23   talk a little bit about Mr. Barrage's role and some of the

24   particular evidence that he was knowingly participating in the

25   smuggling and illegal gold purchasing and false statements to

 1    Customs.

 2         Barrage had a critical leadership role in the

 3    conspiracy, and the evidence against him is strong.  Barrage

 4    has known Defendants -- Co-Defendants Granda and Rodríguez for

 5    over a decade and began working with them initially at HSBC

 6    selling subprime loans and later for an online university.

 7    Barrage recruited both to join him at NTR.

 8         Throughout a significant portion of this conspiracy,

 9    Barrage was NTR's vice president for Latin America and a part

10    owner of its Colombia office.  Barrage supervised both

11    Rodríguez and Granda.

12         In late 2016, law enforcement interviewed Confidential

13    Source 1 regarding his admitted illegal gold money-laundering

14    activities in Peru.  CS 1 explained that he conspired with

15    Barrage, Rodríguez and Granda to traffic in illegal Peruvian

16    gold, much of which involved P.F.

17         CS 1 also explained that the conspiracy evolved over

18    time from using obvious Peruvian front companies to smuggling

19    through Bolivia and Ecuador to using more sophisticated

20    Peruvian front companies to smuggling through farther-out

21    countries, including islands in the Caribbean.

22         CS 1 explained that as early as 2013, Barrage and his

23    co-conspirators were aware that they were purchasing illegally

24    mined gold and aware of Peruvian Customs officials being bribed

25    to approve exports.

1          In late 2016, law enforcement also interviewed

2    Confidential Source 2, CS 2, regarding his admitted illegal

3    gold money-laundering activities in Chile.  CS 2 was introduced

4    to Barrage and Rodríguez through a common contact in Peru with

5    whom CS 2 had smuggled Peruvian gold.

6          During --

7          THE COURT:  Is CS 2 one of his two Co-Defendants?

8          MR. MADERAL:  No.  CS 1 and CS 2 were clients.

9          THE COURT:  Okay.  Go ahead.

10         MR. MADERAL:  During conversations with CS 2, Barrage

11   and Rodríguez bragged about smuggling Peruvian gold through

12   Bolivia and Ecuador.  Rodríguez is a Co-Defendant, your Honor.

13         Barrage and Rodríguez also agreed to participate with

14   CS 2 in smuggling Argentinian gold through Chile.  Barrage and

15   Rodríguez also sought CS-2's assistance in smuggling gold

16   through Ecuador from a potential customer who NTR's compliance

17   department had rejected because he was a possible narcotics

18   money launderer.

19         In addition to these cooperator statements, your Honor,

20   throughout the time of the conspiracy, Barrage and his

21   co-conspirators communicated with each other and their clients

22   primarily via peer-to-peer encrypted messaging applications on

23   their cell phones, including in particular WhatsApp.  We have

24   obtained some of these WhatsApp communications.  In group chats

25   between Barrage, Granda and Rodríguez, all three acknowledge

```
 1    and discuss their conspiracy to purchase illegally mined and

 2    smuggled gold.

 3           For instance, on October 1st --

 4           THE COURT:  Were these conversations intercepted?

 5           MR. MADERAL:  No.  These were obtained via subpoena

 6    from NTR --

 7           THE COURT:  Okay.

 8           MR. MADERAL:  -- who had conducted an internal

 9    investigation and gotten them from the individuals' phones.

10           THE COURT:  Okay.

11           MR. MADERAL:  On October 1st, 2014, Granda traveled to

12    Puerto Maldonado, a known epicenter of illegal gold in Peru in

13    the rainforest, and discussed with Barrage and Rodríguez their

14    sources of illegal Peruvian gold.

15           Granda made reference to himself as a modern-day Pablo

16    Escobar and made reference to purchasing gold under the table

17    with no documents.

18           When one of the co-conspirators asked further

19    questions, Granda commented on the group chat whether or not

20    the co-conspirators were trying to set him up by discussing the

21    same on text message.

22           On October 28th, 2014, co-conspirator Rodríguez

23    traveled to La Paz, Bolivia.

24           And by way of context, your Honor, this is the second

25    year after the Peruvian crackdown when there is a gold spike in
```

```
 1    Bolivia.  So co-conspirator Rodríguez is in Bolivia, and in a
 2    group chat complained that it was the other co-conspirators'
 3    fault that they were doing business in Bolivia because of the
 4    other co-conspirators' role in causing Peru's illegal gold
 5    crackdown.
 6          All three then acknowledged on the group chat
 7    purchasing smuggled Peruvian gold in Bolivia.
 8          In December 19, 2014, Barrage and Granda bragged to
 9    each other about their respective, quote-unquote, "mules" and
10    the amount of gold they had smuggled, even swapping pictures of
11    the young men they evidently employed as the mules.
12          On February 2nd, 2015, Barrage complained about the
13    month-to-date gold figures and suggested to Co-Defendant Granda
14    that he obtain more smuggled Peruvian gold from Bolivia and
15    Ecuador.
16          On May 27th, 2016, Granda, Co-Defendant Granda,
17    complained about the volume of gold brought in that month
18    because of the state of emergency in Madre de Dios, an
19    epicenter of illegal gold, and complains in the group chat of
20    not having been able to smuggle more gold through Bolivia and
21    Guyana, which were "VIP exits," quote-unquote.
22          On June 26th, 2016, Barrage sent a link to a news
23    article about a gold money-laundering arrest in Ecuador and
24    warned his colleagues about wiretaps and communicating via
25    phone.
```

```
 1            The WhatsApp chats contained numerous other

 2    communications, not necessarily group chats.  In one in

 3    particular, Co-Defendant Granda on November 12th, 2014, brags

 4    to friends about a client.  And the clients -- the only clients

 5    they are known to have are their gold supply clients involved

 6    in narcotrafficking and access to wholesale-price kilograms of

 7    cocaine in Bolivia.

 8            Granda's statement was as follows:  "Peru exports the

 9    most illegal drugs in the world.  And the only thing that they

10    export more than that is informal gold.  Remember when I was in

11    Bolivia and I said I know someone that can get a $700 kilo of

12    coke.  Well, I helped him move to Cuzco in Peru and get a

13    million dollars over the border.

14            "He is a German that is my customer from Bolivia.  The

15    only thing that is on Friday my other customer from Cuzco,

16    Peru, put out a hit on him, (inaudible) bad business."

17            So that's part two, your Honor.

18            And now I'm going to talk about what happened upon the

19    arrest of Mr. Granda.

20            So --

21            THE COURT:  Of Mr. Who?

22            MR. MADERAL:  Mr. Granda, Co-Defendant Granda.  There's

23    three Co-Defendants.

24            THE COURT:  Spell the Co-Defendant's last name.

25            MR. MADERAL:  Yes.  G-R-A-N-D-A.  And then Rodríguez,
```

1    common spelling.  And there are three Defendants.

2         And I will say, your Honor, that initially the United

3    States considered only Mr. Granda to be the serious flight

4    risk.  And for that reason, on March 15th, he alone was

5    arrested on a criminal complaint.  The criminal complaint was

6    very lengthy and clearly identified Mr. Barrage and

7    Mr. Rodríguez as co-conspirators Salesman 1 and Salesman 2.

8         So Mr. Granda was arrested on that criminal complaint

9    and his PTD hearing was set for the following Monday, March 20,

10   2017.  So he's arrested on a Wednesday and his pretrial

11   detention hearing is set for a Monday.

12         THE COURT:  What year was that?

13         MR. MADERAL:  That's this year, your Honor.

14         THE COURT:  Okay.

15         MR. MADERAL:  That's several weeks ago.

16         The -- although we did not arrest Mr. Barrage and

17   Mr. Rodríguez at that time, we did have travel alert lookouts

18   for both of them, just in case they attempted to leave the

19   country.

20         Late on Sunday night, the evening before the hearing,

21   Mr. Barrage purchased a ticket sometime around 10:00 at night.

22   He purchased a ticket to travel to Colombia at 3:00 a.m. Monday

23   morning.  And he boarded that flight and traveled to Colombia.

24         Now, he was -- by doing so, whether or not by design,

25   he was successfully able to evade our notice, essentially

1   because since he bought the ticket so soon before the flight.

2   The notice came with very short warning before the flight and

3   came in the middle of the night.  So basically, the agents

4   awoke to realize that Mr. Barrage had traveled to Colombia at

5   3:00 a.m. that morning.

6           What is also important, your Honor, is that the United

7   States knows that Mr. Barrage during this time was aware that

8   he was a target of the investigation in that he was already

9   speaking to counsel.  And in fact, Monday morning at the

10  pretrial detention hearing, his counsel was -- or at least his

11  almost-counsel, not this counsel here, but counsel from Baker

12  McKenzie, was present at the hearing.

13          I say that only because Mr. Barrage was clearly aware

14  that he was a target.

15          Now, since March of 2014, Mr. Barrage has traveled to

16  Colombia numerous times.  He's traveled approximately 75 times

17  to Latin America in general, including 45 times to Colombia.

18  And it is true that he goes on a weekly basis, sometimes twice

19  a month.

20          However, never before in those three-year (inaudible)

21  travel has Mr. Barrage boarded a flight at 3:00 a.m., and never

22  before in the context of being -- knowing he was a target of a

23  criminal investigation.

24          He only twice departed before 9:00 a.m., once at 7:00

25  in the morning and once at 8:20.

```
 1              I should also say, your Honor, that we are aware that

 2    at the time he booked this flight late Sunday night and boarded

 3    at 3:00 a.m., he did have a return ticket for Friday.

 4              THE COURT:  Now, counsel, what did you say this flight

 5    coincided with?

 6              MR. MADERAL:  So --

 7              THE COURT:  The arrest of Mr. Granda?

 8              MR. MADERAL:  Yes.

 9              On Wednesday --

10              THE COURT:  And he was arrested in Colombia?

11              MR. MADERAL:  No.  Mr. Granda flew back from Colombia

12    and was arrested here in the United States.

13              THE COURT:  Okay.

14              MR. MADERAL:  And a criminal complaint was unsealed.

15              THE COURT:  Okay.

16              MR. MADERAL:  That criminal complaint, 29 pages,

17    clearly identifies Mr. Granda and Mr. Rodríguez to themselves

18    as Salesperson 1 and 2, and over the weekend we learned that

19    Mr. Barrage was indeed speaking with counsel.

20              Mr. Granda's PTD hearing was set for that Monday

21    morning.  And it is that Sunday night that he bought a ticket

22    and flew out at 3:00 a.m. Monday morning.

23              THE COURT:  Help me understand the significance of this

24    Defendant going to Colombia at 3:00 in the morning.

25              MR. MADERAL:  We interpret that, your Honor, and it
```

1    appears to us that he was fleeing to Colombia.

2              THE COURT:  Oh.

3              MR. MADERAL:  In addition, your Honor --

4              THE COURT:  Fleeing to Colombia because it was at or

5    about the time that his co-conspirators were arrested?

6              MR. MADERAL:  And he knew that he was soon to be

7    arrested himself.

8              In addition, your Honor, we learned on Tuesday or we

9    learned -- I believe the day after, but we now know that that

10   Tuesday -- and this is another factor, your Honor --

11   Mr. Barrage called the president of NTR.  And Mr. Barrage is a

12   part owner of the business down in Colombia.  And he contacted

13   Mr. Bill LeRoy and informed Mr. LeRoy that he, Mr. Barrage, was

14   in Colombia.

15             Now, according to Mr. LeRoy, who was interviewed by

16   agents, he was surprised that Mr. Barrage was in Colombia,

17   never knew that he was going to travel to Colombia under these

18   circumstances, and told Mr. Barrage that he needed to wrap up

19   his business in Colombia in two weeks.

20             What Mr. LeRoy found unusual was that Mr. Barrage then

21   followed up in saying, "Can you please send me that in an

22   email, that two-week schedule," and indeed later emailed

23   Mr. LeRoy and said, "Bill," something to the effect of, "please

24   send me that two-week schedule in an email."

25             And at or near the time that he sent that email, he

16

1    separately texts Mr. LeRoy and tells Mr. LeRoy, "I need you to

2    put that in email in writing before my attorneys call Frank,"

3    which is me, the United States.

4         So it appeared to us that not only has Mr. Barrage

5    boarded a last-minute flight at 3:00 a.m. to Colombia knowing

6    that he's about to be arrested in the near future, but then he

7    begins to sort of manufacture a reason or attempt to

8    manufacture evidence for a legitimate reason why he's down

9    there.

10        The next day, your Honor, we do hear from now the new

11   counsel for Barrage, Mr. Lopez, who tells us that Mr. Barrage

12   is returning on Friday and would like to surrender.

13        At that point, an emergency red notice had already been

14   obtained for Mr. Barrage.  We asked Mr. Barrage to just turn

15   himself in to the Colombians.  Mr. Barrage, appearing to have a

16   change of heart, moved up his flight back to Miami to Thursday,

17   but was arrested at the airport in Cali, Colombia, prior to

18   boarding that flight.  That was last week.

19        Mr. Barrage was since expelled from Colombia and he's

20   here now, where he was arrested.

21        A little bit of background on Mr. Barrage:  He is not

22   currently employed.  Although he's a naturalized US citizen,

23   Barrage is a UK citizen by birth.  His wife, we understand, is

24   born in Nicaragua.  Barrage has traveled back and forth to

25   Latin America dozens of times since 2014, often spending weeks

17

1    in Colombia.

2         Barrage has family and assets in Colombia.  Barrage

3    spent last Christmas in Colombia.  Barrage is known to have

4    houses in Nicaragua and in Spain.  Barrage is fluent in

5    Spanish.  Barrage is known to have substantial assets and to

6    have received over $2 million during the course of this

7    conspiracy from NTR as payroll, bonuses and ownership

8    distributions.

9         And that is it, your Honor.

10        THE COURT:  Is that it?

11        MR. MADERAL:  Yes, your Honor.

12        THE COURT:  Okay.  Counsel?

13        And you have an agent that you would put on the stand?

14        MR. MADERAL:  Yes, your Honor.  We have Special Agent

15   Colbert Almeida from Homeland Security Investigations present

16   in the courtroom.

17        THE COURT:  Okay.  I believe they would like to talk to

18   him.

19        Is that correct?

20        MR. BEATON:  Your Honor, I think that the facts are

21   largely undisputed.  But for the sake of efficiency, if the

22   Court will allow me to, I'll proceed by proffer --

23        THE COURT:  Okay.

24        MR. BEATON:  -- because I -- Mr. Maderal and I have

25   spoken extensively; and frankly, the facts are largely, as I

1    said, undisputed.

2         THE COURT:  Okay.

3         MR. BEATON:  One of the things that --

4         THE COURT:  When you say "undisputed," I mean --

5         MR. BEATON:  In terms of -- in terms of the

6    risk-of-flight analysis and the pretrial detention hearing.

7         THE COURT:  Okay.

8         MR. BEATON:  And so one of the things that Mr. Maderal

9    mentioned -- and I'll begin here -- is that Samer Barrage

10   travels to Colombia on March 20th, six days after another

11   employee of the company for which he works is arrested.

12        The Government will concede that there was no arrest

13   warrant, no document, nothing preventing Mr. Barrage from

14   traveling.

15        Mr. Barrage -- and I invite the Government to jump in

16   at any time it deems appropriate if I have misspoken, misstated

17   or mischaracterized something.  Mr. Barrage has traveled to

18   Colombia in a similar pattern over 45 times, I believe, in the

19   last year and a half.

20        And I have several examples of how Mr. Barrage books

21   his travel, which is quite similar to how he booked it in these

22   circumstances.

23        And if I can have the Court's indulgence, Mr. Barrage

24   was in Colombia February of this -- February 6th of this year.

25   He departed on a 6:20 fight.  That flight was booked on

1    February 6th at 8:00 in the morning.

2          He departed to Colombia on January 9th of this year at

3    3:30 p.m.  That flight was booked at 11:20 a.m.

4          He departed to Colombia on November 30th at 6:30 p.m.

5    That flight was booked on November 30th at 12:25.

6          And I can go down the list, your Honor, but that is how

7    Mr. Barrage has conducted the business.

8          Now, NTR, the company that the Government mentioned, is

9    a subsidiary of a company called Elemetal, for which

10   Mr. Barrage works.  NTR has a Colombian operation.  The general

11   business model of NTR and Elemetal is to buy gold, aggregate

12   it, sell it to a refinery and move it on.

13         You're hearing these astronomical numbers.  However,

14   the profit margins in this business are very, very small.  So

15   you hear these billion-dollar numbers, but the point is that

16   the gold is sourced from all sorts of different places,

17   including pawnshops and other places.  That is the business

18   model of Elemetal.

19         And I'll get briefly into the substance of the case.

20   just wanted to put into context the travel.  And I'll end with

21   that.

22         But the -- the Government's allegation is that

23   Mr. Barrage and others sourced gold from places that were

24   illegal for various reasons.  And the Government referred to

25   these cooperators in its presentation to the Court.

1    I want to read how the lead agent in this case

2    characterizes one of those cooperators:  "The confidential

3    source" -- and this is quote.  This is Page 4 of the complaint,

4    Footnote 2:  "The confidential source is a convicted felon with

5    other potential credibility issues."

6    This same confidential informant -- and to go further,

7    your Honor, NTR receives a subpoena from the Federal

8    Government, a grand jury subpoena, in April of 2016.  So

9    Mr. Barrage is well aware that there is a government interest

10   in the business.  This is April 16th of 2016.

11   And NTR hires Jones Day to conduct an internal audit,

12   to conduct an internal investigation.  Mr. Barrage cooperates

13   in that internal investigation at every turn.

14   You asked the Government where they had received the

15   WhatsApp chats that they relied on.  And the answer is accurate

16   that it was received pursuant to a grand jury subpoena.  The

17   finer point and the more important point is that way it was

18   received from Samer Barrage.  The telephones that contain those

19   chats were turned in by Mr. Barrage as part of the Jones Day

20   investigation into these grand jury subpoenas.

21   And Mr. Barrage compiled documents; he participated in

22   phone calls and in emails with Jones Day beginning in April of

23   2016.  This has been going on for over a year.

24   So the arrest last week needs to really be broadened in

25   terms of notice.  Mr. Barrage has known that the Government has

1    been investigating for quite some time.

2         There is also, I want to mention -- there's been quite

3    a bit of press surrounding this case, both North American and

4    South American press.  And one of the folks that is -- has been

5    cooperating with the Government, an FBI source, is quoted by

6    Bloomberg as saying that when he was speaking to law

7    enforcement in Chile, when FBI agents from Miami and

8    prosecutors from Miami went to interview this cooperator, that

9    upwards of 15 law enforcement professionals crowded into a

10   meeting room at Santiago, a sprawling prison complex.

11        "And Vilches fed off the attention.  He laughed and

12   seemed to shrug off the seriousness of his situation.  His

13   confessions took on the air of a performance, according to one

14   of the investigators present.  'All you lacked was popcorn,' he

15   says with a laugh."

16        So the article goes on to mention Mr. Barrage's name.

17        So none of this has been a secret to Mr. Barrage.

18   Mr. Barrage has traveled consistently to Colombia in the same

19   pattern that the Government now ascribes this sinister motive

20   to.

21        A couple of other things, getting to Mr. Barrage's ties

22   to the community.  But I would be remiss if I didn't mention

23   these two facts:  When Mr. Barrage booked his flight to

24   Colombia, your Honor, it was a round-trip flight, returning to

25   Miami, leaving on March 20th and returning on March 24th.

1          As soon as a complaint was filed against Mr. Barrage,

2    Mr. Barrage reached out to counsel.  My partner, Jared Lopez,

3    became involved.  I was out of the country.  As soon as I came

4    back, I became involved in the case.  Mr. Lopez immediately --

5    and I will let him address this -- but immediately began

6    attempting to communicate with the Government so that

7    Mr. Barrage could return.

8          And here is the kicker, particularly on a

9    risk-of-flight assessment:  Mr. Barrage was arrested on

10   Thursday, March 23rd, at an airport in Colombia with a ticket

11   to Miami.  He was on his way back, on his way back to deal with

12   this.  He had hired counsel.  On his way to confront these

13   charges.

14         And as I said, Mr. Lopez made numerous efforts to work

15   with the Government to get him back.  Instead, Mr. Barrage

16   spent several days in a Colombian jail and now finds himself in

17   the special housing unit at the Federal Detention Center in

18   Miami.

19         Finally, with regards to his travel:  I would like to

20   make part of the record Defendant's Exhibits 1, 2 and 3.  They

21   are of Mr. Barrage's Volkswagen GTI.  And if the Court wants to

22   see them, I can approach and show you -- but they are pictures

23   of Mr. Barrage's Volkswagen GTI parked in the short-term

24   parking at the Miami International Airport from where his

25   family retrieved it just this last Sunday, not yesterday, but

```
 1    the Sunday before.

 2            So for a man who intended to flee, he took his own

 3    vehicle, parked it in the short-term parking, and it was

 4    ultimately retrieved by his family.

 5            And with the Court's indulgence, I want to get into

 6    community ties, but I think it's an appropriate time to turn

 7    the floor over to Mr. Lopez so that he can discuss his

 8    communications with the Government.

 9            THE COURT:  Okay.

10            MR. LOPEZ:  Good afternoon, your Honor.  Jared Lopez on

11    behalf of Samer Barrage.

12            My intention was to offer these emails either through

13    testimony.  But if the Court would prefer, I can proceed by

14    proffer --

15            THE COURT:  Please.

16            MR. LOPEZ:  -- and read the substance of the important

17    emails.

18            THE COURT:  By proffer.

19            MR. LOPEZ:  Your Honor, our firm got retained on March

20    22nd, 2017, which was the day after the criminal complaint

21    against Mr. Barrage was filed.

22            Immediately upon being retained, I put a call in to

23    Mr. Maderal's office requesting to speak.

24            After not receiving a call back for several hours, I

25    then sent the following email to Mr. Maderal, the Assistant
```

1    United States Attorney in this case, which reads at 2:01 p.m.:

2    "Mr. Maderal, our firm was recently retained by Samer Barrage.

3         "We learned that yesterday a criminal complaint was

4    filed against him.  Mr. Barrage is currently in Colombia on

5    business.  He is scheduled to return to Miami this Friday,

6    March 24th.

7         "I would like to discuss terms of Mr. Barrage's

8    surrender, since he'll be flying back into Miami on this

9    Friday.

10         "Please let me know when you are available.  I left a

11   voicemail message for you earlier today."

12         Between 2:01 and 6:17 p.m., your Honor, I left five

13   email messages for the United States Government, to which I did

14   not receive a response except for on two occasions.

15         Finally, my email communications culminate with the

16   following email at 6:17 p.m.:  "Frank:  I'd like the record to

17   be clear that Mr. Barrage wants to return to the United States

18   to surrender to the Government as a result of being charged

19   just yesterday with a criminal complaint.

20         "We only received a copy of the complaint this morning.

21         "Mr. Barrage has been on business in Colombia since

22   Monday before any charges were filed against him.  He wants to

23   return to the United States immediately to confront the charges

24   and is requesting you allow him to do so without the need for

25   wasted resources and further prejudice to Mr. Barrage through

1    international assistance.

2         "Perhaps if you could find some time to speak with me

3    about this matter, as I've been trying to do with you all day,

4    we could come up with a plan for Mr. Barrage's return.

5         "If you are busy on other matters but -- I know you are

6    busy on other matters.  But I would appreciate if you can make

7    the time.  It would save all parties, the Government, the

8    Court, law enforcement and Mr. Barrage, considerable time and

9    resources.

10        "Thank you.  Jared."

11        It wasn't until later that evening, your Honor, that I

12   received any call from Mr. Maderal to discuss this matter.  At

13   that time, he along with his supervisor, Mr. Tony González,

14   informed me that the process had already been sufficiently

15   advanced in Colombia, that they were unable to somehow revoke

16   the procedure for provisional arrest.

17        I think we all know that in order to get a provisional

18   arrest warrant executed by the Court sent to the Office of

19   International Affairs, processed to the embassy in Colombia

20   takes significant time.

21        So I have a question as to why we were not engaged to

22   allow Mr. Barrage to surrender, as is provided to several other

23   Defendants, not to mention Defendants who are located in a

24   foreign country and have no other way to surrender to United

25   States authorities without the assistance of the Government.

1          Last point, your Honor:  I'd like to note that when

2     Mr. Barrage booked his ticket initially to fly out to Colombia,

3     he booked it on his company credit card.  There was no secret.

4     There was no design to hide the travel.  He used his company

5     credit card, which was free to be examined by everyone within

6     the company.

7          If your Honor would like, I can submit these emails for

8     examination or as an exhibit to this hearing, if you would

9     like.

10          THE COURT:  You can submit them.

11          Okay.  Anything else?

12          MR. BEATON:  If I may continue.  Yes, your Honor.

13          So just to follow up on my colleague's point,

14     Mr. Barrage not only booked a flight on the company credit

15     card; he traveled under his own name, checked in under his own

16     name.  Everything was done under his own name with his US

17     passport.  There was no secret about where he was.  He was in

18     communication with his family.  And that is what I want to talk

19     about next.

20          So we're joined in the courtroom today.  Mr. Barrage

21     has tremendous family support.  And I would like for the family

22     and friends of Mr. Barrage to stand up, please.

23          Let the record reflect that the entire back row has

24     stood up.  Those are Mr. Barrage's family.  And I will

25     introduce them to the Court.

1          We have Amal Gladden, Mr. Barrage's mother; Rafic

2     Barrage, Mr. Barrage's brother; Marie García, his

3     sister-in-law; Iska García Barrage, his wife; Cesar García, his

4     father-in-law; Ana Paola, his sister-in-law; and Alfie Montes

5     Oca, brother-in-law.  And all those people are here in support

6     of Mr. Barrage.

7          And I will tell you a little bit about Mr. Barrage.

8     Mr. Barrage lives in South Miami with his wife and their little

9     4-year-old girl, Sophia.  Mr. Barrage also has a 14-year-old,

10    Samer Barrage, Jr., from a previous marriage.

11         They own their own home in South Miami.

12         Mr. Barrage has never been in trouble.  Mr. Barrage has

13    worked to raise both his son from a previous marriage and get

14    him into Christopher Columbus High School, a local private

15    Catholic high school.  He spends his time with his daughter,

16    Sophia, on the weekend and has been married to his wife, Iska,

17    since 2010.

18         I will also proffer, and if the Court would like to

19    receive testimony, back in the -- I want to say in the

20    beginning of last year, there was a nationally reported gold

21    heist in North Carolina of a Brinks truck.  And it turned out

22    to be an inside job.  And one of the pieces of gold from that

23    heist turned up at Mr. Barrage's shop.

24         And what Mr. Barrage instructed his staff to do -- and

25    they're here, if you want to hear from them -- is to take a

```
1   picture of it with video, weigh it under the video, because he
2   had suspicions about where it was from, and ultimately
3   concluded that this might be gold from that heist.
4         And what did Mr. Barrage do?  He called the Doral
5   Police Department and the FBI and worked with the FBI to set up
6   the gentleman that had brought the gold in to him, who was
7   ultimately detained and questioned by the FBI.
8         Mr. Barrage is a law-abiding citizen.  He is a member
9   of this community with family and friends.  His brother, Rafic
10  Barrage, is a partner at the Washington, DC, office of Baker &
11  McKenzie and is prepared to post bond conditions that, when the
12  appropriate time comes, we will propose.
13        But Mr. Barrage is not a risk of flight, your Honor.
14  Mr. Barrage was arrested on his way back to Miami.  And unless
15  the Court has any other questions for me, I think that that
16  concludes my presentation.
17        THE COURT:  I have no questions.
18        MR. BEATON:  Thank you, your Honor.
19        THE COURT:  Government?  Sir?
20        MR. MADERAL:  Yes, your Honor.  Very briefly.
21        I think two things stand out.  It is true, as
22  Mr. Beaton points out, that Mr. Barrage had a substantial
23  amount of travel back and forth to Colombia prior to this.
24        Now, in a normal hearing, that's actually evidence
25  against -- evidence in favor of risk of flight.
```

1        Here, albeit they're offering it to mitigate his sudden

2   10:00 purchase and 3:00 a.m. flight to Colombia, but I still

3   believe that overall that's evidence in furtherance of risk of

4   flight.

5        Now, Mr. Beaton and Mr. Lopez were careful to point out

6   that they were retained on Wednesday, March 22nd, when they

7   contacted me.

8        And I have here, your Honor, Exhibits 1, 2 and 3, which

9   I'd like to put into evidence.

10        And Exhibit 2 is the email that Mr. Barrage sent to

11   NTR, Bill LeRoy, saying, "Please confirm the direction given

12   last week that I will be transitioning out of the day-to-day

13   activities and the ownership position," talking about Colombia.

14   And then he adds, "As discussed today, the timeline to fully

15   execute this function will take approximately two weeks."

16        And this is the timeline that Mr. LeRoy later told the

17   FBI he thought it was unusual that Mr. Barrage was trying --

18   was trying to nail down this timeline that they had just come

19   up with.  And we interpret that as him trying to fabricate a

20   reason for why he's in Colombia.

21        In addition, your Honor, you know, the day before

22   Mr. Lopez and Mr. Beaton are retained, on March 22nd, we have

23   this text message that Mr. Barrage sent at the same time as

24   sending that email.  And he said, "Just sent you email on

25   Colombia for new process.  Please confirm in writing the

1    transition plan.  Extremely important for my lawyer's

2    discussion later today with Frank."

3            So I don't know who the other lawyer he was talking to

4    was.  But clearly, Mr. Barrage had efforts ongoing to come up

5    and manufacture a reason why he was there.

6            Now, I think -- I suspect is what happened is that

7    Mr. Beaton and Mr. Lopez gave their client excellent advice,

8    which is:  Fleeing to Colombia is a huge mistake.  It makes you

9    look guilty.  It's a horrible place to flee to, because the

10   United States Government can extradite you very easily.

11           And Mr. Barrage quickly changed his mind or quickly

12   realized that he had made a huge mistake.

13           Then Mr. Beaton and -- excuse me -- Mr. Lopez very

14   professionally reached out and attempted to turn the situation

15   into one of surrender.

16           THE COURT:  When you say he made a mistake, what are

17   you referring to?

18           MR. MADERAL:  In fleeing to Colombia at 3:00 a.m. on

19   Monday morning.

20           THE COURT:  So if you're saying that he came to the

21   conclusion that that was a mistake, does that mean that he was

22   not going to stay there?

23           MR. MADERAL:  I think -- I mean, there's no question

24   that as of Wednesday, he was attempting through his lawyers to

25   return.

```
 1              THE COURT:  I'm sorry?

 2              MR. MADERAL:  There is no question that as of Wednesday

 3    he's attempting vis-à-vis his lawyers to return to the United

 4    States.  There's no question.

 5              At worst -- I mean -- excuse me -- at worst,

 6    Mr. Barrage attempted to flee and then changed his mind.  I

 7    can't dispute that, your Honor.

 8              The issue is whether or not he'll change his mind later

 9    again.

10              And Mr. Lopez did reach out; and I emailed him, and I

11    said Mr. Barrage should turn himself in to the Colombian

12    authorities.

13              Mr. Barrage didn't want to do that.  Mr. Barrage wanted

14    to do things his own way, which is book a ticket and come home

15    on his own terms.

16              But at that point, that wasn't really an option, your

17    Honor.

18              THE COURT:  Okay.  Anything else?

19              MR. MADERAL:  Nothing further, your Honor.

20              THE COURT:  Counsel?

21              MR. BEATON:  Your Honor, if I may on that point:  The

22    question becomes:  Why wasn't it an option if that's the case,

23    number one.

24              The issue here is, was Mr. -- is Mr. Barrage a risk of

25    flight?  We believe his actions indicate they were not.
```

1        The Government is attempting to perpetuate a fiction.

2    And I don't accuse them in a casual way.  I'm not -- but I'm

3    pointing this out for all of us.  The fiction is that

4    Mr. Barrage was attempting to flee when he traveled to Colombia

5    on Monday.  And that is a fiction because there is no competent

6    evidence to indicate that Mr. Barrage was going to flee.

7        He had not been charged with a crime.  There was no

8    charging document which -- issued against him.  And that's

9    uncontroverted, because it wasn't until the 21st, a day after

10   he traveled, that a charging document was filed against him.

11       So what else is Mr. Barrage to do when he learns that

12   he's been charged with a crime while he's on business travel,

13   but retain a lawyer and attempt to communicate with the

14   Government, as we attempted to do, that he wanted to come back

15   and confront the charges that had recently been filed against

16   him.

17       That's really the essence.  We believe this idea that

18   he attempted to flee again is a fiction.  And if we start from

19   that point and evaluate Mr. Barrage's conduct afterwards, we

20   believe he demonstrates that he is not a risk of flight.

21       THE COURT:  Government, anything else from you?  Do you

22   have a witness that you want to put on or --

23       MR. MADERAL:  No, your Honor.

24       THE COURT:  Okay.

25       MR. MADERAL:  We'll rest on the argument.

1          THE COURT:  Okay.  This is a complicated matter.

2          MR. MADERAL:  Agreed.

3          THE COURT:  It's a tough case.  This case is about gold

4   and conspiracy to profit from gold.

5          And apparently, the Co-Defendants, the Defendant, had

6   conversations December 19th, February 2nd, May 22nd, June 26th,

7   where they talked about their success.  I think the language

8   was they bragged about their success with respect to ripping

9   off monies that was from gold that didn't necessarily belong to

10  them.

11         Apparently, there was complaints about the volume and

12  there was also some warning of each other during those phone

13  conversations about wiretaps and things of that sort.  That's

14  impressive information.

15         One of the Defendants was apprehended.  I guess he was

16  a salesperson of some sort, but he was apprehended in -- I

17  believe it was Colombia.

18         And the Defendant here in this case went there at a

19  real strange time to assist him.

20         The Government proffers that there's information which

21  reflects his pattern of making trips to Colombia, but this trip

22  was a special trip.  It was a trip that left at 3:00 a.m. in

23  the morning.  And the Government believes that the

24  inconsistency and the reason for going there was not only to

25  check on the person who had been arrested, but to avoid being

```
 1    arrested himself by law enforcement here in the United States.
 2         The question in this case, the big question, is:  Was
 3    he coming back to this country or was he actually fleeing?  And
 4    if he would have come back if he had not been arrested by the
 5    Colombian authorities and then brought back here to the United
 6    States.
 7         It's a tough question.
 8         MR. BEATON:  Judge, I'm sorry to interrupt you.
 9         THE COURT:  Yes.
10         MR. BEATON:  But there are some facts that I think the
11    Government and I can agree that perhaps we have not made
12    clear --
13         THE COURT:  What's that?
14         MR. BEATON:  -- to the Court.
15         The Co-Defendant that was arrested was arrested in
16    Miami.
17         THE COURT:  Okay.
18         MR. BEATON:  The Co-Defendant is I believe either a
19    Bolivian or Peruvian national that was here on travel.  And
20    that was, I would venture to guess, although I don't pretend to
21    know how the Government does its job, but that's why he was
22    apprehended.
23         So the arrest happens here.  It happens four days
24    before Mr. Barrage travels to Colombia.  The two -- and so
25    there was proceedings here in Miami.  There was nothing in
```

35

1      Colombia.  Mr. Barrage travels to Colombia because NTR has a

2      business, a subsidiary, in Colombia.

3              So this gentleman was not arrested in Colombia.  This

4      foreign national was arrested here in Miami.

5              THE COURT:  Okay, Government.  Your indication was that

6      he traveled to Colombia because someone had been arrested

7      there.  Is that correct?

8              MR. MADERAL:  He traveled to Colombia in reaction to

9      the other person's arrest --

10              THE COURT:  Okay.

11              MR. MADERAL:  -- and his perception to his impending

12      arrest.

13              THE COURT:  In reaction to.

14              MR. MADERAL:  I mean, there's a 30-page complaint that

15      probably references Mr. Granda 20 to 30, maybe 40, 50 times as

16      Salesperson 1 and a co-conspirator.

17              So the theory is that he fled in reaction to his own

18      pending arrest, which is why he was talking to lawyers at the

19      same time.

20              THE COURT:  The Government's proffer also included

21      information about family assets in Colombia and Nicaragua and

22      Spain, which clearly establishes that if he does have those

23      assets in those different places, there's places for him to

24      flee to.

25              But again, we come back to the real question:  Was he

```
1    going to return back to America to face these charges?  And

2    would he have returned if he wasn't arrested?  This is an

3    interesting decision.

4         I believe the Government says that he left at 3:00 a.m.

5    to go to Colombia, that he was not going to Colombia at that

6    time to do business.  He was going to Colombia for another

7    reason.  Is that an important factor?  I think that it is.  I

8    think that one could easily come to the conclusion that for him

9    to break his pattern which he had done 45 times previously and

10   go at 3:00 a.m. in the morning was fleeing.

11        Now the question becomes:  Did he change his mind and

12   want to come back to the United States?  Just because he may

13   have left because he was fleeing, but then changed his mind to

14   come back, that would be very interesting.  After he talked to

15   his lawyers, did he change his mind and want to come back to

16   the United States?

17        This is a man who has family, assets in Colombia,

18   Nicaragua and Spain, has houses in those areas.  There are a

19   lot of places for him to go to to avoid prosecution here in the

20   United States for conduct which is really strong against him.

21        I believe that he was fleeing.

22        Now the question becomes:  Is there a bond that we can

23   establish to prevent his -- staying in custody?  Should there

24   be a bond established in this case?  Or should he be pretrial

25   detained?
```

1              He has a lot of assets, access to a lot of assets.  If

2      he's out on bond, he could clearly one day just disappear.  A

3      lot of contacts, a lot of connections, a lot of places to go.

4      Should the Court take a chance with him?

5              MR. BEATON:  We have a proposal on bond, Judge, if --

6              THE COURT:  I'm sure you do.

7              MR. BEATON:  -- that is significant and I think will be

8      persuasive to the Court.

9              THE COURT:  Well, tell me about that.  Tell me about

10     that.

11             MR. BEATON:  Yes, sir.

12             THE COURT:  Tell me about it.

13             MR. BEATON:  So we have to begin with Rafic Barrage.

14             And Rafic, if you will stand up, please.

15             Rafic, as I mentioned --

16             THE COURT:  I'm hearing this, but I'm not saying I've

17     made the determination that he is going to get a bond.

18             MR. BEATON:  No.  I understand.

19             I just want to tell you where it's coming from and what

20     we propose and what the consequences will be, because

21     ultimately what I hope to persuade the Court is that the

22     consequences in abandoning this prosecution are going to be --

23     they're going to be visited more harshly on his family.

24             We are prepared to propose a 1 million, 10 percent bond

25     originating with Mr. Barrage and a corporate surety bond in the

1   $250,000 range with electronic monitoring.

2          I will note for the record that Mr. Barrage's

3   Co-Defendant, Mr. Rodríguez, received a $50,000, I believe it's

4   a -- and Mr. Maderal can correct me -- I think it's --

5          MR. MADERAL:  10 percent (inaudible).

6          MR. BEATON:  50,000, 10 percent, 50,000 corporate

7   surety.

8          So the bond that we are proposing is significantly

9   higher.

10          So in addition to those monetary conditions, we would

11   of course propose that he surrender all travel documents.  We

12   would be agreeable to the same conditions that the Government

13   asked of Mr. Rodríguez; and that is electronic monitoring, that

14   he stay at home and that he remain under house arrest, unless

15   it's to visit with his lawyers or unless it's for some medical

16   emergency.

17          Those are the conditions that we would propose.  I

18   don't know that it gets more restrictive than that it.  He

19   would be living with his wife and with his little girl.  And he

20   has custody of his 14-year-old son from time to time.  But he

21   would not be permitted out of his house.

22          And those are significant monetary conditions.  They

23   would -- they would visit havoc on his family if he were to

24   flee.  They have every confidence that he had absolutely no

25   intention to flee.  And that's what we would propose to the

1     Court.

2           THE COURT:  I'm not certain that that amount would

3     wreak havoc on his family, based upon the proffer the

4     Government made with respect to how much money is involved in

5     this conspiracy.

6           Government, if the Court was leaning towards a bond,

7     what do you think would be reasonable under the circumstances?

8           MR. MADERAL:  Your Honor, let me just note, there's

9     another Defendant who is pretrial detained.  That's Mr. Granda.

10          THE COURT:  Okay.

11          MR. MADERAL:  The problem -- I think your Honor hit the

12    head.  The problem with that bond is that ultimately it's 10

13    percent.  It's $100,000 down and a 250,000 corporate surety

14    bond.  They pay 17 percent.  So that's, you know, less than

15    $200,000 that is ultimately forfeited if he flees to one of

16    these other jurisdictions.

17          And I know surety bonds are -- you know, his brother

18    and his family, who I'm sure have the best intentions and love

19    him very much, signing on it, they're very hard to collect on.

20    It's really only the cash you put in the bank.

21          And, you know, $100,000 plus 17 percent of $250,000

22    just -- for someone who is known to have received over

23    2 million just isn't a lot and has real estate in foreign....

24          It's --

25          THE COURT:  Gentlemen, here is the bottom line:

```
 1    There's too much money in this case.  There's too many places
 2    that this gentleman can flee to if this Court let him out.  I'm
 3    not going to take a chance on him.  I'm going to have him
 4    pretrial detained.
 5          Okay.  Anything else from either side?
 6          MR. MADERAL:  Nothing.
 7          THE COURTROOM DEPUTY:  When do you guys want to come
 8    back for the arraignment and (inaudible)?
 9          MR. BEATON:  If we could have a report date two weeks
10    from today, if that's acceptable to the Court.
11          THE COURTROOM DEPUTY:  So that would be April 18th,
12    10:00.
13          MR. BEATON:  Yes.  Thank you.
14          THE COURT:  All right.  Thank you.
15          THE COURTROOM DEPUTY:  All rise.
16          MR. MADERAL:  Thank you, your Honor.
17          THE COURTROOM DEPUTY:  Court is in recess.
18          (Proceedings concluded.)
19                     C E R T I F I C A T E
20
21        I hereby certify that the foregoing is an
22    accurate transcription of the proceedings in the
23    above-entitled matter to the best of my ability.
24
25                          /s/Lisa Edwards
      _____
```

```
 1      DATE                LISA EDWARDS, RDR, CRR
                            Official Court Reporter
 2                          United States District Court
                            400 North Miami Avenue, Twelfth Floor
 3                          Miami, Florida 33128
                            (305) 523-5499
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```