```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION
              CASE NO. 17-20215-CR-SCOLA
```

UNITED STATES OF AMERICA,                    MAY 25, 2017
                                             3:18 P.M.
         Plaintiff,


   vs.


SAMER H. BARRAGE,

         Defendant.           PAGES 1 THROUGH 20

---

```
              TRANSCRIPT OF HEARING ON MOTIONS
         BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFF:    Mr. Francisco Raul Maderal, Jr., AUSA
                      UNITED STATES ATTORNEY'S OFFICE
                      SOUTHERN DISTRICT OF FLORIDA
                      99 N.E. 4th Street
                      Miami, Florida  33132

                              and

                      Mr. Juan Antonio Gonzalez, Jr., AUSA
                      UNITED STATES ATTORNEY'S OFFICE - HIDTA
                      11200 N.W. 20th Street
                      Suite 101
                      Miami, Florida  33172


FOR THE DEFENDANT:    Mr. Marcos Beaton, Jr., Esq.
(Barrage)             BLACK, SREBNICK, KORNSPAN & STUMPF
                      Suite 1300
                      201 South Biscayne Blvd.
                      Miami, Florida  33131

1      (The calendar call held here was not ordered transcribed by
2 counsel.)
3      (Open Court, 3:18 p.m.)
4          THE COURT:  All right.  So Mr. Barrage has filed a
5 motion to revoke pretrial detention order.  So it's your
6 motion, I'll hear from you first.
7          MR. BEATON:  Thank you, Judge.  And if I may address
8 the Court from here?
9          THE COURT:  Yes.
10         MR. BEATON:  So as the Court knows, the standard of
11 review today is de novo, we start from scratch, and the first
12 thing, and I think at this point it's uncontroverted, the
13 correct standard and presumption for this Court to apply is a
14 presumption in favor of release.
15         The biggest legal issue, as we cited in our papers,
16 was that the magistrate judge incorrectly applied a presumption
17 in favor of detention.
18         The charge with which Mr. Barrage has been accused
19 does not carry that presumption in favor of detention, it
20 favors a presumption in favor of release.
21         The other thing that this Court is evaluating is
22 whether there were clear errors of fact made during that
23 pretrial detention hearing, and before I move on to the bulk of
24 my presentation, I will correct a few that the magistrate judge
25 made.

03:19      The magistrate judge appeared to find that Mr. Granda, Mr. Barrage's codefendant, had been arrested a few days earlier in Colombia, and that Mr. Barrage was traveling to Colombia to check on his codefendant.  I corrected Judge White, but I want to make sure that this record is clear that that is not the case, that the codefendant was arrested several days earlier in Miami and Mr. Barrage flew to Colombia for reasons that I will get into in a moment.

The magistrate judge also found that Mr. Barrage's mother lives in the country of Georgia in the pretrial detention order.  In fact, Mr. Barrage's mother lives in Macon, Georgia.  And I've been to Macon, Georgia, and I can see where one would get easily confused that it might be another country, but it is in fact in the United States.

So the third thing that I want to correct is that Mr. Barrage's lawyers were engaged in negotiations with the government once my firm was retained for his surrender in Colombia and that Mr. Barrage chose not to do that.  We in fact were retained on March 22nd -- and I'll get into the time line in a second -- and that is when discussions with the government began.  As we noted in our papers, those discussions were sparse.  The best information that my law firm had was that Mr. Barrage should surrender to some then unidentified Colombian authorities.

So Judge White asked during the pretrial detention

03:21

1   hearing, after observing that this was a close call, whether
2   Mr. Barrage would have returned to the United States had he not
3   been arrested, and the answer is uncontrovertibly yes.
4       And it goes one step further, Judge. Not only would
5   Mr. Barrage have returned to the United States but for the fact
6   that he was arrested in Colombia, the arrest in Colombia is the
7   very thing that prevented him from returning to the United
8   States. And so as the Court makes its 3142 analysis today, we
9   should begin from this point, and that is something that the
10  government said at the pretrial detention hearing. But for
11  this March 20th round trip airplane travel to Colombia, the
12  government did not consider Samer Barrage a risk of flight.
13      And we've written extensively about it and our papers
14  are pretty exhaustive, so I'm just going to hit the high
15  points. And Judge White wondered out loud whether it was
16  Mr. Barrage's intent to return, as I just said a second ago,
17  and here's why the answer to that question is yes. Mr. Barrage
18  booked round-trip travel to Colombia on March 20th returning on
19  Friday, March 24th. He was arrested in a Colombian airport on
20  March 23rd holding a ticket to Miami. Mr. Barrage retained our
21  law firm on March 22nd to immediately begin confronting these
22  charges. Mr. Barrage drove his own car to the Miami
23  International Airport and parked it in short-term parking.
24      There was some talk at the pretrial detention hearing
25  about Mr. Barrage attempting to, after the fact, manufacture

03:23

his reasons for being in Colombia, and the government alleges that Mr. Barrage's explanation for being in Colombia, to transition away from the day-to-day operations of a company that Mr. Barrage had some ownership interest in Colombia, along with Elemetal, the parent company that employed NTR Miami, the government claims that Mr. Barrage manufactured that reason after the fact.

We've been able to demonstrate to this Court something that was not available to Judge White. That on March 19th, the day before Mr. Barrage travels to Colombia, the CEO of Elemetal, Bill LeRoy, writes an email to Brinks Security in Colombia saying that Samer Barrage will be transitioning away from the day-to-day operations of Zona Franca in Colombia.

We've also produced to the Court the documents that Samer Barrage executed and notarized in Colombia which effectuated that transition away. Mr. Barrage was down there to effectuate this transfer away with every intention to return to Miami and with every intention to face these charges.

Mr. Barrage's ties to the community. Mr. Barrage is 39 years old. He's been married to his wife Iska since 2010. They have a four-year-old little girl named Sophia and Mr. Barrage has a 14-year-old son from a previous marriage. Mr. Barrage has never been in trouble. Mr. Barrage owns a home in South Miami. I have in the courtroom Mr. Barrage's UK passport with which Mr. Barrage did not travel to Colombia.

03:25

1   Had it been his intent to fly to Colombia to flee, he would
2   have certainly traveled with his passport from the United
3   Kingdom, which we now have in the courtroom and we are prepared
4   to surrender.
5           I have in the courtroom Mr. Barrage's daughter's
6   passport, which we are prepared to surrender, and I have his
7   wife's U.S. and Nicaraguan passports which we are prepared to
8   surrender.
9           I want everybody who is in support of Mr. Barrage to
10  stand up in the courtroom.  And as the Court will note, one
11  side of the courtroom is filled with family and friends of
12  Mr. Barrage.  Iska Barrage, his wife; Amal Gladin, his mom;
13  Rafic Barrage, his brother, who flew in from Washington, D.C.,
14  a partner at Baker McKenzie; Cesar Garcia; Blanca Mantilla;
15  Roberto Garcia; Emilio Garcia; Harold Garcia; Cesar Garcia,
16  Jessica Martinez; Ana Alvarado; Alfonso Montes de Oca; Maria
17  Garcia; Nick Turner; Ana Paula; Rigoberto Paula; Eduardo
18  Marquez.  Mr. Barrage enjoys tremendous community support.  His
19  ties are here.  His family is here.
20          And for the reasons that we outlined in our papers,
21  the travel to Colombia was travel to effectuate what
22  Mr. Barrage ultimately effectuated, which was the transfer from
23  the day-to-day operations of the company and he was coming
24  back.
25          So to answer Judge White's question, yes, he would

have come back if he had not been arrested. As a matter of fact, he did not come back because he was arrested.

And I'll reserve the rest of my time after the government's presentation, Your Honor.

THE COURT: Okay.

MR. MADERAL: Thank you, Your Honor. The factors. The first factor is the nature and circumstances of the offense. It is exactly the same as the factor with which, with respect to Mr. Granda, weighed so strongly in favor of detention. It's a billion-dollar money laundering scheme. It's transnational in nature. It took place over years. It involved dozens and dozens of foreign contacts. It involved smuggling cash and gold across borders. Mr. Barrage himself is in text messages discussing his mules. It involves foreign bribery, one of the specific items, Your Honor, listed in the order detaining Mr. Granda.

The guidelines sentence is significant, approaching the 20-year maximum, all the same as Granda. The weight of the evidence, as with Mr. Granda, is strong. There were some legal arguments made in the response -- I mean, excuse me, in the motion that the government addressed in the response. They are not meritorious and the weight is strong.

The history and characteristics of Mr. Barrage is almost identical to that of Mr. Granda -- to those of Mr. Granda. He is a foreign citizen. He has family in

03:28

Colombia.  He has family in Lebanon.  He has a foreign business in Colombia.  He has foreign bank accounts.  Like Mr. Granda, he has foreign houses.  In fact, he has two.  He has a house in Nicaragua where his wife is a citizen.  I will also note that he is fluent in Spanish.  He has a home in Spain.  The total extent of his assets in Nicaragua, Colombia, and Spain are unknown, Your Honor.  He has in fact only been a citizen of the United States, I understand, for six years.

In the last several years he has flown to Latin America almost a hundred times, Your Honor, 75 separate trips to numerous countries in Latin America, including having spent last Christmas in Latin America.

At the pretrial detention hearing, we proffered that he spent last Christmas in Colombia.  It was in fact Nicaragua, where his wife is a citizen and where he owns a home.

In addition to his family ties, obviously, yes, his wife is Nicaraguan and he spent last Christmas in Nicaragua.  Your Honor, these foreign ties are as strong if not stronger than Mr. Granda's.

On top of that -- on top of that, and I think it's important to put this 3:00 a.m. flight in perspective.  That is just an additional incredibly strong foreign tie.  At the very least, we know that it is an additional evidence of foreign ties.  That in the midst of all of this, in the midst of his coconspirator being arrested, in the midst of speaking with

03:30  1  defense counsel for the first time, he buys a ticket at
2  10:00 p.m. for a 3:00 a.m. flight, having never, in 75 previous
3  flights to Colombia, never once left before 9:00 a.m.  He flies
4  to Colombia at 3:00 a.m.  If nothing else, that is just more
5  evidence of an incredibly strong foreign tie.
6         In addition, we know that on the 22nd, when
7  Mr. Beaton's law firm --
8         THE COURT:  What's the significance of his email
9  followed by the text --
10        MR. MADERAL:  Right.  So the sig- --
11        THE COURT:  -- to the person so...
12        MR. MADERAL:  The significance of that is we contact
13 NTR and we say, do you know or did you know that Mr. Barrage
14 was in Colombia?  Was there some reason for this?  And we are
15 told, in no uncertain terms, We had no idea he was going to
16 Colombia.  We never imagined that he would go to Colombia.  We
17 knew, because of the arrests and because of this case, that he
18 needed to transition out of the business, but we never told him
19 to go to Colombia.  We never imagined that that would require
20 him going to Colombia.
21        And then he calls -- he calls the president of NTR
22 from Colombia and says, Hey, I'm here in Colombia, surprising
23 the president, and the president says, Well, you need to be out
24 of there in two weeks, be done with that.
25        He later follows up in an email and says, Will you

03:31  tell me that in writing?  Which the president of NTR told us he found highly suspicious, as if Mr. Barrage was trying to create a paper trail of something that had not prior -- had not existed prior to that.

And at the same time that he sends that email saying, Hey, will you please confirm our plan, this new plan in writing, he sends him a separate text, That email is really important so I can give to my lawyers to give to Frank, who is me, the prosecutor.

So it clearly shows that Mr. Barrage maybe had a change of heart, maybe he had already accomplished whatever his purpose was, maybe he's not longer panicked, who knows why, but he is beginning to realize that he has made a mistake or is beginning to try and cover his tracks.

It is the next day, despite him sending text messages to NTR saying his attorneys need something, it is not until the next day that Mr. Beaton's firm is retained and we are contacted by attorneys.  That's the 22nd.  And in fact, the day after that, the 23rd, three days after he has to suddenly fly to Colombia for the first time ever at 3:00 a.m., he's getting a document signed with an attorney, after he's already been told to turn himself in.  That very document, which was attached to their motion as evidence, supposed evidence of his legitimate reason for being there all along, signing one document three days later, three days after a 3:00 a.m. flight,

03:33

1   after being told that there's an arrest warrant and he needs to
2   turn himself in to the Colombians.
3           We also know he was told he should surrender himself
4   to the Colombian authorities.  He didn't.  He did not surrender
5   himself.  He did not follow up.  Which Colombian authorities?
6   How do I do that?  For several days he remained in Colombia.
7   What was he actually doing in Colombia?  To this moment, Your
8   Honor, we still have no explanation other than some vague
9   assertion of a transition plan of what he was doing in Colombia
10  other than apparently meeting with an attorney for the first
11  time the 22nd and then signing three documents on the 23rd.  It
12  doesn't add up.  It doesn't make sense.
13          And more to the point, Your Honor, the best you could
14  say about this travel, the best one could say, is that it is a
15  huge question mark, definitely evidence of foreign ties,
16  definitely evidence of the means to flee, and a huge question
17  mark as to what his intent was.  That question mark does not
18  weigh in his favor in the balance of the evidence.  Overall, it
19  is just more evidence of his very strong foreign ties and his
20  risk of flight.  Thank you, Your Honor.
21          THE COURT:  All right.
22          MR. BEATON:  I'm going to address some of the
23  government's comments in turn.  First, the government spoke of
24  the weight of the evidence, which as the Court knows under the
25  case law is the least weighed factor under 3142.  Let's put a

03:34  1   couple of things in perspective.  These accounts that
       2   Mr. Barrage was doing business with on behalf of NTR,
       3   Mr. Barrage didn't just unilaterally pick the accounts and
       4   begin doing business.  Elemetal, as we wrote in our reply, had
       5   one of the most robust anti-money laundering programs in the
       6   world.  They had sought out and employed from another refinery
       7   perhaps the leading expert in the world on anti-money
       8   laundering compliance.  Mr. Barrage and the others had to
       9   process applications on behalf of people who were supplying
      10   gold to then be vetted by these folks with the anti-money
      11   laundering compliance program and then cleared.  That is how
      12   people became suppliers of NTR.
      13          Next, let's talk about those text messages where they
      14   talk about mules.  The text messages are juvenile, they are at
      15   times grotesque, they are joking.  The text message to which
      16   the government referred about mules talks about a mule
      17   defecating 150 kilograms of gold, which is a physical
      18   impossibility.  It was, as I say, juvenile banter, which we
      19   expect, as the evidence develops in this case, is going to be
      20   shown as nothing more than that.
      21          In the complaint, there is a picture of a gentleman
      22   that the government has referred to as a mule.  That gentleman
      23   is an employee of the Colombian business in an office role who
      24   agreed to take a picture at a Christmas party with a funny
      25   looking hat.  It was not a mule of any kind.

03:36   1              Mr. Granda. This Court also heard the appeal of
        2    Mr. Granda. Mr. Barrage and Mr. Granda are not similarly
        3    situated in almost any way. Mr. Granda has no children and no
        4    residence in Miami. Mr. Barrage has young children and a
        5    residence in Miami. In fact, Mr. Barrage is more similarly
        6    situated to Renato Rodriguez, to whom the government agreed a
        7    stipulated bond of I believe $100,000 in total was appropriate.
        8    50,000 personal surety, 50,000 corporate surety.
        9              The bottom line is, Your Honor, Mr. Barrage's travel
       10    to Colombia, we have demonstrated, is for the purpose that we
       11    put in our papers, and this notion that the CEO was surprised
       12    that Mr. Barrage was traveling for the purpose of this
       13    transition is belied by the CEO's own March 19th email talking
       14    about that very fact, the day before Mr. Barrage was arrested.
       15              And to put this entire thing in context, the
       16    government had subpoenaed NTR in April of 2016, a year before
       17    this trial, nearly a year before this travel. Mr. Barrage
       18    cooperated completely with the Jones Day lawyers that were
       19    running the investigation for the company. As a matter of
       20    fact, those text messages to which the government now refers,
       21    those phones were turned over to the Jones Day lawyers by
       22    Mr. Barrage when he was asked for them.
       23              This investigation had been going on for over a year
       24    and Mr. Barrage had traveled to Colombia, to South America, and
       25    back to be with his family every single weekend. I have

```
03:39   1    documents here, and I've shown them to the government, that
        2    Mr. Barrage was in Disney World on the 17th and 18th and that
        3    he was at the Miami Heat/Portland Trailblazer game on
        4    March 19th, the night before he flew off.  And he takes this
        5    red-eye flight, which puts him in Bogota, Colombia, in the
        6    early morning so that he can get a full day of business in.
        7    There is nothing sinister about this flight.  The circumstances
        8    surrounding this flight demonstrate that Mr. Barrage was
        9    traveling there and coming back.  So the government's concern
       10    that but for this flight --
       11              THE COURT:  Why would he decide to go on a 10:00
       12    p.m. -- it was a Sunday night, right?
       13              MR. BEATON:  It was a Sunday night, correct.
       14              THE COURT:  Okay.  So --
       15              MR. BEATON:  Why not do a 10:00 p.m. flight?  The
       16    game --
       17              THE COURT:  I know, he's at the game, yes, so he's
       18    going to go, but why would he buy the ticket after the game?
       19    Why all of a sudden at 10 o'clock -- if he's going to say, oh,
       20    I'm going to go to the game and then I'm going to go to
       21    Colombia, I mean, you would think you would need to plan for
       22    that, so why wouldn't he buy the ticket earlier in the day?
       23              MR. BEATON:  So you'll see, Judge, and we
       24    demonstrated --
       25              THE COURT:  And why is he flying at 3:00 a.m. when
```

03:40  1  he's never -- is it true that he's never flown that flight in
       2  75 trips to Colombia?
       3          MR. BEATON:  So in 75 trips you will find numerous
       4  first-time instances of travel, and what I mean by that is, for
       5  example, folks who do a lot of business in New York or let's
       6  say who do a lot of business in California and want to get an
       7  early start on the day, I mean, if you take the 5:30 a.m.
       8  flight from Miami to New York, it's packed, there's a lot of
       9  people who routinely travel that way.
      10          What you will find in Mr. Barrage's travel is that his
      11  travel was relatively spontaneous based on need and based on
      12  what was happening, and there are limited instances of him
      13  taking that same flight.
      14          Moreover, what you will find from Mr. Barrage's
      15  pattern --
      16          THE COURT:  And is it true that he was at the
      17  codefendant's bond hearing?
      18          MR. BEATON:  Mr. Barrage?
      19          THE COURT:  Yes.
      20          MR. BEATON:  No, I don't think he was at the
      21  codefendant's bond --
      22          THE COURT:  He knew that he had been arrested.
      23          MR. BEATON:  He knew that he had been arrested.
      24          THE COURT:  He had an attorney.
      25          MR. BEATON:  Who had an attorney?

03:41  1       THE COURT: Didn't he have an attorney before you?
2       MR. BEATON: There was an attorney I believe with whom
3  he had spoken. I don't know -- ultimately we get retained on
4  the 22nd. But Mr. Granda is arrested on the 15th. It is a
5  stretch to say that Mr. Barrage would have known his arrest was
6  any more imminent on April 16th of 2016 when the subpoenas
7  start going out and he understands that there's a criminal
8  investigation.
9       There is a March 9th Bloomberg article to which I
10 referred this Court in which one of the government's main
11 cooperators puts on a show for reporters and talks about what
12 ultimately gets mimicked in the government's complaint.
13      So Mr. Barrage was on notice that he was being looked
14 at, that he was being targeted, there is no question about
15 that. But to suggest that this travel five days later somehow
16 demonstrates that he knew that his arrest was going to happen
17 imminently is no different than his travel on the 16th, the
18 17th, the 18th, and the 19th. He was with his kids at Disney
19 and he was at the Miami Heat game.
20      THE COURT: And was he told and were his lawyers told
21 to surrender in Colombia?
22      MR. BEATON: I'm sorry?
23      THE COURT: Were his lawyers told that he should
24 surrender in Colombia?
25      MR. BEATON: So I have the email here, and if you'll

03:42 1   give me a second I can pull it up.  My partner, Jared Lopez --
2   I was out of the country, my partner Jared Lopez communicated
3   with the government on a serial basis on March 22nd, the day
4   that we were retained, and attempted to surrender Mr. Barrage
5   here in the United States.  The government's response, and this
6   is from memory, is the process is too far along.  He should
7   surrender to the Colombian authorities.
8          Now, we're talking about March 22nd in the afternoon.
9   Mr. Barrage gets arrested at 11:00 a.m., attempting to board an
10  11:00 a.m. flight to Miami the next morning, which is why I
11  laid out that time line for the Court.  Let's not contort this
12  time line and stretch it out.  22nd we get retained.  23rd in
13  the morning, very early in the morning, he finalizes those
14  documents to get out of the company and is on -- attempting to
15  come back to the United States ahead of schedule.
16         So things happened relatively quickly.  This isn't --
17  we're talking the afternoon of the 22nd and then the morning of
18  the 23rd is what we're talking about.  There were no Colombian
19  authorities identified.  Mr. Barrage was attempting to come
20  back.  He had retained us.  He's retained us permanently.  And
21  the way that he acted demonstrates that there was no intent to
22  flee.  Thank you, Judge.
23         MR. MADERAL:  Your Honor, just very briefly.  I have
24  here the list of every single flight he has ever taken.  Not
25  once in several years, 75 flights, has he ever flown on this

```
03:44   1   flight to Colombia at 3:00 a.m.  He only twice -- only twice in
        2   several years flew before 9:00 a.m.  Once at I believe 8:50,
        3   another time perhaps at 7:30, but there was never once this
        4   3:00 a.m. flight.  It was an unprecedented flight for
        5   Mr. Barrage.
        6            (Pause.)
        7            THE COURT:  Okay.  I'm looking at the government's
        8   response and, again, they're citing that the defendant
        9   returned, attempted to fly back on March 24th.  You just said
       10   he attempted to fly back on March 23rd.  So was it the 23rd or
       11   the 24th?
       12            MR. MADERAL:  Mr. Beaton is telling me it's the 23rd.
       13   I don't have it in front of me so, I mean, it's possible that
       14   that is a mistake, Your Honor.  I don't know.  Again, it was
       15   the 21st, I believe, that he is sending a text, so it's still
       16   two days earlier that he's sending the text message about --
       17   text message needing to get an email for his lawyer.  It's the
       18   next day that we tell him to turn himself in.  And so even if
       19   he did return on the 23rd, that's still several days after he
       20   knows he has been complainted and is subject of an arrest.
       21            MR. BEATON:  So the 23rd is a Thursday, Your Honor,
       22   the 24th being a Friday, and then the 20th in the morning being
       23   that Monday, the 19th being a Sunday afternoon.  Mr. LeRoy's
       24   email goes at 8:43 p.m. that Sunday the 19th.  He travels
       25   Monday the 20th, attempts to return on Thursday morning, the
```

03:47  1  23rd, the day after we are retained.

2  THE COURT: All right. Well, I think it seems to me
3  that it would have been very unwise to fly to Colombia at 3:00
4  in the morning right after somebody else that he knows has been
5  arrested and detained in the case, but there is some ostensible
6  reason why he would do that unrelated to fleeing, so I am not
7  going to consider that specific flight in making my
8  determination.

9  But in light of all the other factors in the case,
10  this is a billion-plus-dollar scheme involving international
11  travel, international transaction, foreign bribery, the
12  evidence is very strong against the defendant, based upon the
13  government's proffer, the sentence he's facing is very
14  significant, he has significant ties to several other
15  countries, and I don't believe that there are any conditions of
16  release that could assure his appearance, so I am going to deny
17  the defendant's motion to revoke pretrial detention.

18  All right. Thank you all for your presentations.
19  MR. MADERAL: Thank you, Your Honor.
20  MR. BEATON: Thank you, Judge.
21  (Proceedings concluded at 3:49 p.m.)
22  * * * * *
23
24
25

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) ss: |
| SOUTHERN DISTRICT OF FLORIDA | ) |

C E R T I F I C A T E

I, Carly L. Horenkamp, Certified Shorthand Reporter in and for the United States District Court for the Southern District of Florida, do hereby certify that I was present at and reported in machine shorthand the proceedings had the 25th day of May, 2017, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 20.

IN WITNESS WHEREOF, I have hereunto set my hand at Miami, Florida, this 7th day of June, 2017.

/s/ Carly Horenkamp

Carly L. Horenkamp, RMR, CRR, CRC
Certified Shorthand Reporter