Sealed

FILED by SJA D.C.
JAN 17 2018
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. — MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA )
 )
v. ) Case No. 17-CR-20215
 ) The Honorable Robert N. Scola, Jr.
SAMER H. BARRAGE )

## SAMER BARRAGE'S SENTENCING MEMORANDUM

Samer Barrage is 40 years old and has no criminal history. He is a loving husband to Iska Barrage, his wife of nearly eight years. He is an amazing father to their five-year old little girl, Sophia, and his 15-year old son from a previous marriage, Samer Barrage, Jr. As outlined in the numerous letters written to the Court on Mr. Barrage's behalf (appended as Exhibit A), he has touched the lives of many in positive way.

Unfortunately, poor decisions, in the pursuit of success and money, have now placed Mr. Barrage before this Court as a convicted felon, having pleaded guilty to one count of conspiring to commit money laundering under 18 U.S.C. § 1957, in violation of 18 U.S.C. § 1956(h).

Mr. Barrage acknowledges the significant harm caused in facilitating numerous illegal activities by laundering money through the purchase of gold from South America. But he cannot take back what he did. What Mr. Barrage is doing – indeed, all that he can do – is demonstrate a genuine remorse for his crime as well as a commitment to atone for his wrongdoing by pleading guilty, accepting responsibility, assisting the government in its investigation of others who are involved in gold-based money laundering, as well as disgorging much of the money he made by settling and satisfying his forfeiture obligation, which has included borrowing money from family.

We are told that by the time of sentencing, the government will have filed a motion for a sentence reduction pursuant to U.S.S.G. § 5K1.1, requesting a reduction from the 10-year

sentence advised by the guidelines, to a 7.5 year sentence, *i.e.*, a 25%-reduction. This, coupled with the government's expected statement that it fully expects to file a motion for further sentence reduction under Rule 35, demonstrates the quality of Mr. Barrage's cooperation.

For these reasons, including the ones we discuss below, we would ask the Court for a modest downward reduction from 7.5 years.

## PROCEDURAL BACKGROUND

Mr. Barrage comes before the Court for sentencing after having pleaded guilty to a single count of conspiring to commit money laundering under 18 U.S.C. § 1957(a), in violation of 18 U.S.C. § 1956(h). On the date of sentencing, Mr. Barrage will have complied with all of the terms of his plea agreement (DE 83). This includes the settlement and satisfaction of the personal money judgment entered against Mr. Barrage, which represented the proceeds Mr. Barrage derived from the offense. *See* [Plea Agreement (DE 83) ¶ 13]. This also includes Mr. Barrage's agreement to fully cooperate with the government and its investigators. *See* [Plea Agreement (DE 83) ¶ 8]. In fact, Mr. Barrage's cooperation has resulted in the plea of a co-conspirator and in a recently-filed indictment.

The parties agree that Mr. Barrage's offense level, before applying any reductions for acceptance of responsibility, is 42 – due almost entirely to the astronomical value of the gold that passed through the hands of NTR during the conspiracy. *See* [Plea Agreement (DE 83) ¶ 11]. With a three-level reduction for acceptance of responsibility, the parties agree that Mr. Barrage's final total adjusted offense level should be 39, resulting in an advisory Guideline sentence range of 262 to 327 months (Criminal History Category I). *See* [Plea Agreement (DE 83) ¶¶ 7, 11]. However, because the 10-year statutorily authorized maximum sentence under 18 U.S.C. § 1957 is necessarily less than the minimum applicable Guideline sentencing range outlined above, Mr.

Barrage's advisory Guideline sentencing range becomes 10 years, or 120 months, pursuant to U.S.S.G. § 5G1.1(a). *See* [Plea Agreement (DE 83) ¶ 11].

As the Court is aware, the advisory Guideline sentencing range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). Accordingly, Mr. Barrage submits the following sentencing memorandum to assist the Court in determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a).

## LEGAL ARGUMENT

A sentencing court "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). Accordingly, after calculating the proper offense level under the Guidelines and giving the government and the defendant the opportunity to argue for the sentence they believe to be appropriate, the district judge must consider each of the § 3553(a) factors and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker*, 543 U.S. 220, 245 (2005). In doing so, the Court must fashion the least restrictive sentence that vindicates the sentencing imperatives of 18 U.S.C. § 3553(a)(2). *See Kimbrough*, 552 U.S. at 101. 18 U.S.C. § 3553(a) provides:

> (a) The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> > (1) the nature of the circumstances of the offense and the history and characteristics of the defendant;
> >
> > (2) the need for the sentence imposed—
> >
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>
> (5) any pertinent policy statements—
>
> > (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code .
> > . . .
>
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Application of the § 3553(a) factors allows a sentencing court "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).

As applied to Mr. Barrage's case, these factors urge a modest variance or departure. Such a sentence would be "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough*, 552 U.S. at 111.

The Court has the authority to reduce Mr. Barrage's sentence by way of a downward departure. As the Eleventh Circuit held in *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995), "a district court has the discretion to reward a defendant's acceptance of responsibility by departing downward when U.S.S.G. § 5G1.1(a) [the advisory Guideline provision capping the sentence at the statutory maximum] renders U.S.S.G. § 3E1.1 [the advisory Guideline provision recognizing acceptance of responsibility] ineffectual in reducing the defendant's actual sentence."

Indeed, the *Rodriguez* court observed:

> A departure from the sentence prescribed by § 5G1.1(a) when the defendant's acceptance of responsibility has not been duly recognized is consistent with the goals of the guidelines. As discussed above, the guidelines contemplate that a defendant's acceptance of responsibility will be recognized at sentencing. Moreover, one of the "legitimate societal interests" served by rewarding a defendant's acceptance of responsibility is providing an incentive to engage in plea bargaining. Plea bargaining is "an essential component of the administration of justice" that should be encouraged because it keeps the justice system from becoming overburdened with full-scale trials.

*Rodriguez*, 64 F.3d at 643 (internal citations omitted). Mr. Barrage's case presents this exact scenario – one in which his acceptance of responsibility (which has included not just a guilty plea, but significant cooperation and early payment of his forfeiture) and the corresponding three-level reduction for acceptance of responsibility have been rendered ineffectual by the application of U.S.S.G. § 5G1.1(a).

Accordingly, Mr. Barrage moves this Court for a departure on this basis.

## THE § 3553(a) FACTORS

1. **Mr. Barrage's History and Characteristics**

    A. **Personal and Family History**

Mr. Barrage is a dedicated and loving husband to Iska, his wife of nearly eight years. Moreover, Mr. Barrage is also a devoted and doting father to the daughter they have together – five-year old Sophia Barrage – and to Mr. Barrage's son from a prior marriage – fifteen-year old Samer Barrage, Jr. The outpouring of letters demonstrates the kind of family man, friend and boss that Mr. Barrage has been throughout his life. *See* [Sentencing Letters, Exhibit A].

Mr. Barrage was born on August 26, 1977, in London, United Kingdom, to Hadi Rafic Barrage and Amal Kamle. By the time Mr. Barrage was 11 years old, his family suffered severe financial hardships and sadly broke apart. His father left them, married another woman, and began a new family. At 13, Mr. Barrage went to boarding school and his mother struggled mightily to keep her two sons in top schools.

Eventually, Mr. Barrage's mother met Dr. Collier Gladin, an American-based physician from Macon, Georgia, and they married when Mr. Barrage was around 17 years old. Mr. Barrage's mother moved the entire family to Macon, Georgia.

By 1999, Mr. Barrage had earned his Bachelor's degree from Mercer University, and after graduating, moved to Miami to accept a position with HSBC and to live with his girlfriend Claudia Gallardo. By the end of 2001, Mr. Barrage had married Ms. Gallardo, and they welcomed their first child – Samer Barrage, Jr., into their family.

Mr. Barrage took advantage of the tuition reimbursement program offered by HSBC and enrolled in the MBA program at the University of Miami. He worked full-time, provided for his young wife and child while pursuing his MBA studies. In 2003, Mr. Barrage earned his MBA

and began quickly climbing the management ranks at HSBC earning several awards along the way in recognition of his ability to turn around several branches and district-areas into top performers within the company. However, Mr. Barrage's impact during his tenure at HSBC affected much more than the company's bottom line. His colleague from HSBC, Mr. Zachary Mazur, recounted the following about Mr. Barrage:

> My professional success is built from how I was brought up, but ultimately on Samer Barrage who took a chance on me in 2005. For the last 12 years I have known Sam (Samer) as my mentor, leader, and friend. . . . With Sam I was rapidly promoted to AVP/Branch Manager, and led a struggling team to be ranked 6th out of all branches in the state of Florida in my first 9 months of being promoted. I was then promoted out of his area to Orange City to open a new branch. He celebrated my success, and closely monitored my growth even though there was no benefit to him in doing so. At this point he became my true mentor, one that would take calls at any hour of the day, one that would provide advice with no benefit on his end, and one who shared in my success as a friend.

*See* [Letter of Zachary Josef Mazur, Exhibit A]. Another colleague from Mr. Barrage's days at HSBC, Mr. David Antle, similarly recounts:

> I have known Samer Barrage since 2005. We met as colleagues, where Sam was a branch manager and I was a VP - Divisional Manager at HSBC. I watched Samer emerge into an incredible executive, who was driven to see his team succeed . . . Samer's management was style was unique. He was very motivational, and truly cared about what impact each product had on the client and the employee. He created and published daily performance trackers for the employees, so they could see how quickly their results could be impacted with each loan. He showed his employees how to care for their clients, and how that generated repeat business and referral business. He wanted to know what were personal goals that each employee had, and why they wanted to achieve those goals. He always tied their goals back to their families, and showed them how they could exceed those goals.

*See* [Letter of David Antle, Exhibit A].

Unfortunately, the financial crisis of 2007-2008 affected HSBC's business model, which centered heavily on home loans and consumer financing. And, despite his history of stellar performance, HSBC demoted Mr. Barrage in favor of more tenured employees. Around this time, Mr. Barrage's marriage to Ms. Gallardo was suffering and they were divorced by the end

of 2007. Notwithstanding having been divorced for nearly 10 years, Ms. Gallardo had this to say about Mr. Barrage:

> He is almost 3 years younger than me but showed me he was a responsible man at a young age. He was only 21 when we got married but soon got a good job so we could save to buy a house and start our lives together. He started his MBA at University of Miami also while working and having our son, Samer Jr, now 15 years old. He was a young father but managed to be the best in every single situation. In 2007 we got divorced but remained friends until today. I thank him for all the good and for our son who needs his father by his side like before. In 13 years he had never forgot or ignored all the responsibilities with his son. He was always on time to pick him up the day he was supposed to even if he was living far away from us. This structure gave my son Samer confidence and security, even though we were not together as a family he would always be there for him. Having his father 3 weekends of every month gave him a great bond and relationship.

*See* [Letter of Claudia Gallardo, Exhibit A].

After the downsizing at HSBC, Mr. Barrage took a position within the graduate admissions department at Kaplan University. Mr. Barrage quickly turned around his department – which was on the verge of closing – into the top performing department in the company and was promoted to director of the entire graduate admissions department. During these years and by the end of 2010, Mr. Barrage also met and married his current wife, Iska.

Iska worked at Elemetal. Elemetal, formerly known as NTR Metals, is a precious metal refiner that originated in Texas. At some point, Elemetal began expanding by opening offices around the country, including Miami, Florida. However, at least as it concerned the Miami office, the principals of Elemetal had drastically underestimated the necessity of hiring personnel with the ability to interface with Spanish-speaking customers. As a result, Elemetal sought to hire local Miamians. At the end of 2010, Mr. Barrage accompanied his wife to the Elemetal holiday party, where he and Elemetal discussed pursuing gold-buying opportunities in South America. Not long after Mr. Barrage was hired to do just that.

Elemetal is a precious metals refinery. As such, Elemetal buys unrefined precious metals, such as gold, refines them, and sells them for profit. The profit margins are very small, often less than 0.5% of the value of the amount of gold refined. Accordingly, Elemetal's profitability is directly driven by the volume of gold and other precious metals it is able to purchase and refine. Elemetal employs sales staff to find and buy as much gold as possible.

Accordingly, Elemetal incentivized Mr. Barrage, and his co-defendants, to purchase as much gold as possible with volume-based commissions. In turn, Mr. Barrage and his co-defendants negotiated terms with potential Elemetal clients. The primary term of negotiation was the price Elemetal would pay for the gold, often expressed as a percentage of the spot price for gold, *e.g.*, 99.6%. Once the terms were agreed, the clients would ship gold from Latin America or the Caribbean to Elemetal in Miami. Elemetal would then evaluate the gold and make wire payment to the client overseas.

Early on, Mr. Barrage began by purchasing relatively small amounts of gold for Elemetal from the Caribbean before expanding that business model south into South America. Ultimately, Mr. Barrage and his co-defendants were able to enter the lucrative Peruvian gold market where they purchased almost $1B of gold for Elemetal during 2013. The amount of gold Mr. Barrage purchased on behalf of Elemetal would end up being in the billions – a staggering number. However, as the Court knows by now, that number does not represent Mr. Barrage's gain or even the gain of Elemetal, who profited handsomely from Mr. Barrage's purchases. The margins on the gold purchased were almost always less than 0.5% of the amount paid for the gold. As the Supreme Court reminded us in *Gall*, a sentencing court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). The *Gall* Court specifically rejected

the use of rigid mathematical formulas to determine whether a variance from the advisory Guideline sentence range is justified. *Id.* at 47. The Court also rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range. *Id.*

Moreover, there is perhaps no better example of the oft-quoted observation made by the Supreme Court in *Pepper v. United States*, than Mr. Barrage:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime, and the punishment to ensue.

*Pepper v. United States*, 562 U.S. 476, 487 (2011).

When he joined Elemetal, Mr. Barraged certainly did not set out to commit a crime. But, as we sit here today, it is clear that Mr. Barrage failed. However he rationalized his own behavior to himself – whether it was an "everyone is doing it" mentality, or using the company's AML program for cover, or the comfort of not personally doing some of the overt acts himself, or whether it was simply looking away at certain times – Mr. Barrage failed to follow the law and participated in a conspiracy to commit money laundering.

But these "human failings," *see id.* at 487, stand in stark contrast to another episode in Mr. Barrage's life, when he was presented with the opportunity to buy stolen gold.

In March of 2015, three individuals successfully executed a daring heist and robbed 10 gold bars, worth approximately $5M, off of a TransValue courier truck traveling along a dark stretch of North Carolina highway. The courier truck was carrying gold and silver belonging to the Opa-locka-based refiner Republic Metals Corporation ("RMC"), and was traveling from Miami to Massachusetts when the heist occurred. The details of this movie-esque heist were

chronicled in a series of Miami Herald articles published in March, April, and May of 2016. *See* [Exhibit B].

Shortly after the heist, an individual named Guillermo Morales[1] – a local Miami pawnshop owner – approached the NTR Miami office where he had been a recognized regular customer and attempted to sell to NTR one of the gold bars stolen during the heist. The NTR employee working that day immediately reached out to Mr. Barrage and asked for his authorization to execute the transaction. Instead of relying on the word of a familiar customer and approving the transaction and realizing approximately $200K in profits, Mr. Barrage instructed his employee to weigh the gold bar using a scale equipped with the camera in order to capture the distinctive markings on the gold bar, including RMC's unique logo/stamp.

Mr. Barrage also instructed the NTR employee to explain to Morales that NTR would not purchase the gold bar without the necessary accompanying paperwork, including a certification of the gold bar's origins. Suspecting it was a bar from the heist (which had made national news) Mr. Barrage immediately reached out to the FBI. Morales left the NTR office because he did not have the requisite paperwork with him.

When Morales returned to NTR with a smaller portion of the gold bar he had managed to saw off manually, Mr. Barrage instructed his employee to delay the transaction and the customer long enough for the FBI to arrive at the NTR office. Eventually, the FBI arrived and apprehended Morales at the NTR Miami office and obtained one of the gold bars taken during the courier heist in North Carolina. The FBI then attempted to use Morales and the NTR Miami office to lure any additional co-conspirators possessing gold bars from the heist.

---

[1] This individual appears as and is also referred to as "G.M." in relevant court documents and filings.

In the end, Mr. Barrage's quick thinking and cooperation led to the apprehension of Guillermo Morales and the recovery of one of the gold bars from the heist. Morales led authorities to the successful apprehension, prosecution, and conviction of Miguel Bover[2] – the individual who provided Morales with the gold bar. *See United States v. Bover*, 15-CR-20321-Bloom/Valle (defendant sentenced to 36 months). Eventually, the Morales and Bover arrests led to the successful apprehension, prosecution, and conviction of Adalberto Perez and Robert Cabrera – two of the three individuals who executed the initial courier heist in North Carolina. *See United States v. Perez*, 16-CR-20158-Lenard/Goodman (defendant sentenced to 135 months); *United States v. Cabrera*, 16-CR-20160-Moore/McAliley (defendant sentenced to 235 months). Lastly, Yanan Mirabal – an individual who served as a local fence for some of the gold bars taken during the heist – was also successfully apprehended, prosecuted, and convicted. *See United States v. Mirabal*, 16-CR-20159-Moreno/O'Sullivan (defendant sentenced to credit for time served).[3]

Both remarkable and vexing – speaking to the human failings that can both mitigate and magnify – Mr. Barrage called the FBI and turned in the suspected stolen gold in 2015 – while he was in the middle of his own conspiracy to launder money by purchasing gold. If there was ever evidence of whether a criminal defendant is capable of redemption and has demonstrated that he possesses qualities that are inconsistent with the illicit behavior that brings him before this Court, this is it.

---

[2] This individual's last name appears in news articles and court filings as both "Bovar" and "Bover."

[3] Copies of select and relevant filings related to each of the above described cases have been appended to this memorandum as Exhibit [C].

As Judge Rakoff, of New York's Southern District, so eloquently said:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed court to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd* 301 Fed. App'x 92 (2d Cir. 2008).

### E. The Nature of the Offense

There is no downplaying that Mr. Barrage played an important role in purchasing billions of dollars of gold throughout South America on behalf of his employer, Elemetal. He often turned a blind eye to the various illegal and questionable practices that were apparently rampant throughout many sectors of the gold mining industry, and he was able to rationalize his behavior to himself and the others involved in this conspiracy.

The seriousness of this offense and the magnitude of his error in judgment are not lost on Mr. Barrage. He is now a convicted felon and a disgraced member of the community. The story of his personal and professional life will forever have an ugly footnote attached to their successes. As he wrote in his statement of acceptance, Mr. Barrage also failed at perhaps the most important thing to him: being a father. He failed to lead by example and he has to explain that to his children for the rest of his life. He put himself in this position and he accepts full responsibility.

Since being indicted, Mr. Barrage has made it a priority to make up for his conduct through acceptance of responsibility, settlement and satisfaction of his forfeiture obligations, as well as full cooperation with government investigators. He has so far done what he can, in

recognition of the wrong he has committed, to make the government whole again. And he continues to do so through his cooperation, which began even before he pleaded guilty.

### 3. The Need for the Sentence to Reflect the Seriousness of the Offense . . .

Even a modest reduction represents a truly significant punishment. The Department of Justice's own National Institute of Justice echoed these findings in a July 2014 publication. *See* National Institute of Justice, *Five Things About Deterrence* (July 2014) (citing Daniel Nagin, *Deterrence in the 21st Century*, CRIME AND JUSTICE IN AMERICA: 1975-2025 (ed. Michael Tonry, University of Chicago Press, 2013)). The National Institute of Justice sets forth the following:

- The *certainty* of being caught is a vastly more powerful deterrent than the punishment. Research shows clearly: If criminals think there's only a slim chance they will be caught, the severity of punishment—even draconian punishment—is an ineffective deterrent to crime. *Id.* (emphasis added).

- Sending an offender to prison isn't a very effective way to deter crime. Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime. *Id.*

- Police deter crime by increasing perception that criminals will be caught and punished. *Id.*

- Increasing the severity of punishment does little to deter crime. Laws and policies designed to deter crime are ineffective partly because criminals know little about the sanctions for specific crimes. *Id.*

Finally, as Judge Rakoff observed in *Adelson*, "there is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514 (internal citations omitted).

A sentence below 7.5 years will still be a significant punishment to Mr. Barrage while providing general and specific deterrence, and sufficiently vindicate the sentencing imperatives at 18 U.S.C. § 3553(a)(2).

4. **The Kinds of Sentences Available**

As the Court is aware, it has the authority to consider a wide range of sentencing alternatives, up to and including probation (18 U.S.C. §§ 3553(a)(3); 3561(a)), special conditions of home confinement (U.S.S.G. § 5F1.2) and, if the Court deems it appropriate, service to the community (U.S.S.G. § 5F1.3). However, Mr. Barrage is asking for a modest reduction from the 7.5 years urged by the government.

5. **The Sentencing Guidelines**

Mr. Barrage acknowledges that the PSIR correctly calculates the Guideline range applicable to his case. *See* [PSIR (DE 110) ¶¶ 27 – 36].

6. **Pertinent Policy Statements**

There are no pertinent U.S. Sentencing Commission policy statements to consider.

7. **Unwarranted Sentencing Disparity**

A modest reduction after accounting for the government's motion under U.S.S.G. § 5K1.1 would not result in any unwarranted sentencing disparity between Mr. Barrage and similarly situated defendants.

8. **The Need to Provide Restitution to any Victims of the Offense**

As stated in Mr. Barrage's PSIR, there are no identifiable victims of Mr. Barrage's offense of conviction. Accordingly, restitution is not appropriate. *See* [PSIR (DE 110) ¶ 24]. However, it is important to note that prior to sentencing, Mr. Barrage has fully settled and satisfied the personal money judgment. *See* [Exhibit D]. He has had to borrow money from family to accomplish this and marks another example of Mr. Barrage's commitment to doing all

he can, going forward, in rectifying the wrongs that have him before the Court and fully supports an imposition of a sentence below 7.5 years.

Respectfully submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421

By: _____
Marcos Beaton, Esq.
Florida Bar No. 0573787
Mbeaton@royblack.com

*Counsel for Defendant Samer H. Barrage*